438 A.2d 1125 (1981)
In re J. S.
No. 303-81.
Supreme Court of Vermont.
December 1, 1981.
John J. Easton, Jr., Atty. Gen. and Edwin L. Hobson, Jr., Asst. Atty. Gen., Montpelier, for plaintiff.
Robert B. Hemley of Gravel, Shea & Wright, Ltd., Burlington, for McClure Newspapers, Inc.
Stephen S. Blodgett and Peter C. Stern, Burlington, for defendant.
Before BARNEY, C. J., BILLINGS, HILL and UNDERWOOD, JJ., and DALEY, J. (Ret.), Specially Assigned.
UNDERWOOD, Justice.
A juvenile, J.S., appeals from an order of the juvenile court allowing the public to attend proceedings to adjudge him a delinquent child for his alleged participation in the murder of one girl and the sexual assault of another.
In an attempt to comply with the confidentiality provisions of our juvenile shield law, 33 V.S.A. § 651, one trial judge issued *1126 an order of closure which barred the public from the proceedings. The Burlington Free Press was granted permission to intervene for the sole purpose of being heard on its petition for access to any and all of the proceedings involving J.S. A second trial judge granted the petition, holding that 33 V.S.A. § 651(c) violated the First Amendment. He ordered that J.S.'s juvenile proceedings be held in open court and that the public and the news media be permitted to attend.
J.S. sought relief from this order by two means. He was granted this interlocutory appeal pursuant to V.R.A.P. 5 from the order opening the proceedings, and at the same time he filed a petition for extraordinary relief, pursuant to V.R.A.P. 21, seeking to vacate the order and to exclude the public.
A majority of this Court in a previous order disqualified the office of the State's Attorney of Chittenden County, which had not opposed public access, from representing the State. In re J. S., 140 Vt. ___, 436 A.2d 772 (1981). The office of the Attorney General now appears for the State, and also on its own behalf to defend the constitutionality of our juvenile statutes, Title 33, Chapter 12, pursuant to V.R.A.P. 44.
The principal question before us is whether the limited holding of Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), that the First Amendment contains a right of access to criminal trials extends to a juvenile proceeding to determine delinquency and treatment. We must also consider additional arguments put forward by the Free Press in support of public proceedings.
Only a brief recital of the facts is necessary to enable us to grapple with the legal issues raised in this appeal. Two 12-year-old Essex Junction girls were brutally assaulted by two persons in or near an area park. One was killed. The other, left for dead, managed to survive. J.S. and a 16-year-old are the alleged assailants. J.S., who is 15, has been charged as a juvenile delinquent and will have his proceedings heard in juvenile court. The 16-year-old is awaiting trial as an adult in superior court on charges of first-degree murder and sexual assault.
Our juvenile shield law requires that juvenile court proceedings be confidential. The relevant portions of that law provide:
(c) Except in hearings to declare a person in contempt of court, the general public shall be excluded from hearings under this chapter and only the parties, their counsel, witnesses and other persons accompanying a party for his assistance and such other persons as the court finds to have a proper interest in the case or in the work of the court, may be admitted by the court. If the court finds that it is to the best interest and welfare of the child, his presence may be temporarily excluded, except while a charge of his delinquency is being heard at the hearing on the petition.
(d) There shall be no publicity given by any person to any proceedings under the authority of this chapter except with the consent of the child and his parent or guardian.
33 V.S.A. § 651.
On appeal, J.S. contends that 33 V.S.A. § 651(c) mandates that the juvenile proceedings be closed to the public and the news media, and that closed proceedings are perfectly consistent with the United States and Vermont Constitutions. The State, in effect, concurs. Both J.S. and the State ask us to reverse the court below and close the proceedings.
The Free Press makes three arguments in support of public proceedings: (1) The court below was correct in holding that 33 V.S.A. § 651(c) was unconstitutional. (2) Even if the statute is constitutional, the proceedings should be public because the court below erroneously found itself without discretion under § 651(c) to admit reporters, and in the proper exercise of that discretion, they should be admitted. (3) Even if we disagree with the first two arguments, the publicity involving J.S. has been and will be so pervasive that the reasons for confidentiality no longer exist, so a special exception from the general requirement of confidentiality *1127 should be made in this case to allow public access. We disagree with all three arguments and therefore reverse.

I.
The Free Press claims that Richmond Newspapers, supra, dictates that the general public and the news media have a First Amendment right to attend juvenile delinquency proceedings and to publicly report what they see and hear in the juvenile court during those proceedings. See also, Herald Association, Inc. v. Ellison, 138 Vt. 529, 533-34, 419 A.2d 323, 325-27 (1980).
The question facing the Supreme Court in the Richmond Newspapers case, however, was whether the public and press possess a constitutional right of access to criminal trials. Richmond Newspapers, supra, 448 U.S. at 558, 100 S.Ct. at 2818. The Supreme Court concluded that such a right existed. The plurality held that the combination of the unbroken tradition of open criminal trials at common law and the fact that openness of criminal trials serves important First Amendment goals requires public access, absent overriding interests. That limited holding, however, does not extend to the case at hand.
Far from a tradition of openness, juvenile proceedings are almost invariably closed. All 50 states, in fact, have some sort of juvenile shield law to limit public access. Smith v. Daily Mail Publishing Co., 443 U.S. 97, 105, 99 S.Ct. 2667, 2672, 61 L.Ed.2d 399 (1979). Further, juvenile proceedings are not criminal prosecutions, a fact which makes at least some of the First Amendment purposes served by open criminal trials inapplicable. Finally, inherent in the very nature of juvenile proceedings are compelling interests in confidentiality which the Supreme Court itself has endorsed in cases cited below, and which we hold override any remaining First Amendment goals which access might serve.

A.
The holding in Richmond Newspapers applies only to criminal trials. Our juvenile law expressly provides that juvenile proceedings are not criminal. The very purpose of the juvenile delinquency law is to provide an alternative to criminal prosecutions of children. Thus, the Legislature has stated:
(a) The purposes of this chapter are:
....
(2) to remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior ....
....
(b) The provisions of this chapter shall be construed as superseding the provisions of the criminal law of this state to the extent the same are inconsistent herewith.
33 V.S.A. § 631.
An order of the juvenile court in proceedings under this chapter shall not be deemed a conviction of crime ....
33 V.S.A. § 662(a).
We underscored the fundamental characteristic of a juvenile proceeding in In re Rich, 125 Vt. 373, 375, 216 A.2d 266, 267-68 (1966):
It is a protective proceeding entirely concerned with the welfare of the child, and is not punitive. The procedures supersede the provisions of the criminal law and laws affecting minors in conflict with the authorizations of the juvenile court statutes. The inquiry relates to proper custody for the child, not his guilt or innocence as a criminal offender.
The only issue in a juvenile proceeding is "the care, needs and protection of the minor and his rehabilitation and restoration to useful citizenship." In re Delinquency Proceedings, 129 Vt. 185, 191, 274 A.2d 506, 510 (1970).

B.
The court below compared the similarities and differences of juvenile proceedings and criminal trials, cited the United States Supreme Court decisions in Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); and In re *1128 Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and concluded that a juvenile proceeding was a criminal prosecution for the purposes of the First Amendment. The differences and similarities it discussed were irrelevant in light of the fundamental distinction between the punitive purpose of a criminal prosecution and the rehabilitative purpose of a juvenile proceeding.
The cases cited by the court below do not support the proposition for which they were cited. Each merely extended certain procedural protections to the juvenile. Nothing in any one of them suggests that the Legislature may not further protect the juvenile by closing the proceedings. If anything, the great concern for the welfare of the child that they demonstrate suggests that the child's interests should prevail when in conflict with public access. To the extent that they are relevant at all, the precedents cited by the court below indicate that confidentiality is appropriate.
Thus it appears to us that a juvenile proceeding is so unlike a criminal prosecution that the limited right of access described in Richmond Newspapers does not govern. Certainly, neither the United States nor Vermont Constitutions expressly mandate a right of access. Nor do our opinions or those of the United States Supreme Court hint that such a right exists. The court below was in error when it held otherwise.

C.
Even if there were some constitutional right of access which presumptively reached juvenile proceedings, public access would not automatically follow. Rather, the First Amendment interests would first have to be weighed against the countervailing interests in confidentiality. See Richmond Newspapers, supra, 448 U.S. at 581, 100 S.Ct. at 2830 (plurality opinion), 585-86, 598, 100 S.Ct. 2832-2833, 2839 (Brennan, J., concurring).
The punitive purpose of criminal proceedings raises First Amendment issues which are not present here. There, public access serves as a check against unjust conviction, excessive punishment and the undeserved taint of criminality. See id. at 564-74, 100 S.Ct. at 2821-2826 (plurality opinion), 589-98, 100 S.Ct. 2834-2839 (Brennan, J., concurring). The juvenile proceeding, by contrast, involves no criminal conviction, 33 V.S.A. § 662(a), no punishment, In re Rich, supra, 125 Vt. at 375, 216 A.2d at 267-68, and, when confidential, no taint of criminality, 33 V.S.A. § 631(a)(2). Thus fewer First Amendment interests are at stake here than was the case in Richmond Newspapers.
The other side of the balance, however, is more heavily weighted here than in Richmond Newspapers. The compelling interests in confidential juvenile proceedings have been recognized and implicitly endorsed by the United States Supreme Court. See, e.g., Smith v. Daily Mail Publishing Co., supra, 443 U.S. at 104-05, 99 S.Ct. at 2671-2672; In re Gault, supra, 387 U.S. at 25, 87 S.Ct. at 1442; In re Winship, supra, 397 U.S. at 366, 90 S.Ct. at 1073-1074.
Justice Rehnquist has reiterated the Supreme Court's concern for maintaining the confidentiality of juvenile proceedings:
It is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity. This insistence on confidentiality is born of a tender concern for the welfare of the child, to hide his youthful errors and `bury them in the graveyard of the forgotten past.' The prohibition of publication of a juvenile's name is designed to protect the young person from the stigma of his misconduct and is rooted in the principle that a court concerned with juvenile affairs serves as a rehabilitative and protective agency of the State.
Smith v. Daily Mail Publishing Co., supra, 443 U.S. at 107, 99 S.Ct. at 2673 (Rehnquist, J., concurring) (citations omitted).
Even Davis v. Alaska, cited by the Free Press for the proposition that the State's *1129 interest in keeping juvenile matters confidential must yield to an overwhelming First Amendment right, supports the opposite conclusion. The Court there assumed the propriety of confidentiality in juvenile proceedings when it said, "We do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender." Davis v. Alaska, 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974). If a right of access existed, there certainly could be no anonymity.
The holding in the Davis case only went so far as to protect the defendant's Sixth Amendment right to cross-examination in the context of the factual situation confronting that court. Id. The Court concluded that the State's witness, a juvenile called to identify the defendant, must submit to cross-examination about his juvenile delinquency record, because the defendant's right outweighed the state interest. Id.
Any right of the Free Press to report what takes place in juvenile court is hardly equivalent to the defendant's right to cross-examine the witness who fingered him as the prime suspect in a breaking and entering case, especially where a possible motive of the juvenile for turning State's witness was to take the heat off himself as a suspect in the same crime.
There are, however, many reasons why the State's compelling interests in the confidential juvenile proceedings prescribed by 33 V.S.A. § 651(c) and § 33 V.S.A. § 651(d) override the countervailing interests of the public and the news media in access to those proceedings and the news media's interest in publicly disseminating what its reporters learn while attending.
Publication of the youth's name could impair the rehabilitative goals of the juvenile justice system. Confidential proceedings protect the delinquent from the stigma of conduct which may be outgrown and avoids the possibility that the adult is penalized for what he used to be, or worse yet, the possibility that the stigma becomes self-perpetuating, thereby making change and growth impossible. Publication of a delinquent's name may handicap his prospects for adjustment into society, for acceptance by the public, or it may cause him to lose employment opportunities. Public proceedings could so embarrass the youth's family members that they withhold their support in rehabilitative efforts. See Note, Freedom of the Press vs. Juvenile Anonymity: A Conflict Between Constitutional Priorities and Rehabilitation, 65 Iowa L.Rev. 1471, 1484-85 (1980).
The argument of the Free Press that its pervasive newspaper publicity has already compromised these goals and so it ought to be allowed to attend and publicize the proceedings concerning J.S., ignores still another purpose served by confidentiality. Publicity sometimes serves as a reward for the hardcore juvenile delinquent, thereby encouraging him to commit further antisocial acts to attract attention. Id. Further, the legislative goals of expunging the juvenile's delinquency record are vitiated if the same information could at any subsequent time be obtained freely from newspaper morgues.
Neither the Vermont nor the United States Constitution, as interpreted by the United States Supreme Court or our Court, provides a right of public access which overrides the compelling interests served by our juvenile confidentiality shield statutes. The trial court erred in holding otherwise and must be reversed.

II.
The Free Press insists, however, that its reporters are among those persons contemplated by the Legislature as having "a proper interest in the case or in the work of the court," 33 V.S.A. § 651(c), and that the second judge erred when he intimated in his order that the statute gave him no discretion to grant news reporters access to juvenile proceedings.
This argument collides with 33 V.S.A. § 651(d), which specifically prohibits any of those persons admitted under § 651(c) from publicly disseminating information gained *1130 from a juvenile hearing "except with the consent of the child and his parent or guardian." No provision is made in either § 651(c) or § 651(d) to give the judge discretion to permit public dissemination of these proceedings.
The Free Press, however, would have us hold that § 651(c) gives the judge discretion to admit their reporters and that § 651(d) forbids them from publishing what they learn once admitted. So construed, they say, § 651(d) is unenforceable as an unconstitutional prior restraint of the press in violation of the First Amendment. Oklahoma Publishing Co. v. District Court, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).
This statutory interpretation runs afoul of common sense and the canons of construction which we observe to keep ourselves within the bounds of judicial authority. Our function is not to pass upon the validity of a legislative concern or the wisdom of the means the Legislature chooses to address that concern, but merely to make sure that no constitutional bounds are exceeded. Andrews v. Lathrop, 132 Vt. 256, 262, 315 A.2d 860 (1974).
When faced with a choice, we assume that the Legislature intended a constitutional result and construe statutes accordingly. In re Delinquency Proceedings, supra, 129 Vt. at 188, 274 A.2d 506. Further, we avoid a construction which leads to absurd or irrational results. State v. Tierney, 138 Vt. 163, 412 A.2d 298 (1980). Reading § 651(c) and § 651(d) together, to give effect to each, id., leads to the inescapable result that a desire to publicly disseminate the facts of a juvenile proceeding is not "a proper interest in the case or in the work of the court." 33 V.S.A. § 651(c).
These two sections of the juvenile shield law are clear and unambiguous. The Legislature did not intend that either the news media or the general public should attend juvenile hearings or report what transpired there. We do not base this conclusion on a single sentence or word or phrase in a sentence, but we have looked at the provisions of the whole juvenile law, 33 V.S.A. Chapter 12, and to its objects and its policy. Philbrook v. Glodgett, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).

III.
The Free Press and other members of the news media apparently obtained the name of J.S. and his involvement in the murder and sexual assault of the two young girls in Essex Junction after examining the affidavits of probable cause in the two cases pending against the 16-year-old adult in superior court. Information about the juvenile will inevitably be disclosed at the adult's trial. Because this legally obtained information has been flagrantly publicized by the news media, and because more is to come, the Free Press next argues there is no longer any reason for the confidentiality imposed by 33 V.S.A. § 651(c) and § 651(d) and the Court should drop the barriers for this case as a special exception.
This argument also has several flaws. First, as we have already noted, publicity sometimes serves as a reward for incorrigible delinquents, encouraging the very behavior sought to be deterred. Secondly, this approach calls for a case by case analysis to determine if, when, and to what extent access to juvenile proceedings should be limited. Third, such a case by case analysis lets the news media determine which juvenile proceedings will be open to the public simply by turning up the volume of publicity concerning any case that strikes their fancy. Fourth, decisions to open proceedings will then be based, not on the child's needs, but on chance circumstances. Finally, it is not just the name of delinquents which are protected by the juvenile shield law. Other matters which surface in a juvenile proceeding are just as worthy of anonymity as the juvenile's name. They include the very fact of the adjudication of delinquency and the taint of criminality emanating therefrom (33 V.S.A. § 631(a)(2)); the specific program of treatment, training and rehabilitation ordered *1131 and the locale in which it takes place (33 V.S.A. § 631(a)(2)); the name of the individual or organization to whom custody of the juvenile may be entrusted (33 V.S.A. § 632(a)(10)); the fact and conditions of probation (33 V.S.A. § 632(a)(14)); disposition reports and recommendations made by the commissioner of social and rehabilitation services or the commissioner of corrections to the juvenile court (33 V.S.A. § 655); the disposition order of the juvenile court (33 V.S.A. § 657); law enforcement reports and files concerning the minor (33 V.S.A. § 663), as well as fingerprints and photographs (33 V.S.A. § 664), and the files and records of the juvenile court itself (33 V.S.A. § 665), including dismissal of the petition (33 V.S.A. § 654). These are all part and parcel of the record of a young person's life which the Legislature shielded from public access.

IV.
To summarize, the Free Press has failed to establish that any right of access to J.S.'s juvenile proceeding is contained in the United States or Vermont Constitutions. The juvenile shield law does not give the court below discretion to make the proceedings public. The fact that J.S.'s name is already a household word in Essex Junction, and that the nature of the offense and his alleged participation with a named adult defendant in certain crimes will be disclosed in the trial of the adult, is no reason to dismantle our juvenile court system. Confidential proceedings continue to serve overriding interests.
Any limitations in the juvenile justice system will not be cured by a public trial of J.S. If the Free Press feels that the underlying purposes of our juvenile laws are outmoded and no longer valid, it should not look to this Court, but to the Legislature to change the law. Only the Legislature has the power to relax the limitations imposed by 33 V.S.A. § 651(c) and § 651(d) upon the general public and the news media if it believes that would be more desirable than the present law. As of the commencement of these juvenile proceedings against J.S., however, the legislative intent is clear. Juveniles, as a class, are shielded from public exposure of any proceedings conducted in juvenile court to determine delinquency.
The order of the District Court of Vermont, Unit No. 2, Chittenden Circuit, granting the public and the press the right to attend any and all proceedings in juvenile court concerning J.S. is reversed.