## State of Vermont v. Percy O. Lund

[475 A.2d 1055]

No. 82-047

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed February 3, 1984

172

*James D. McKnight,* Orange County State's Attorney, Chelsea, for Plaintiff-Appellee.

*William J. Donahue* of *Otterman and Allen, P.C.,* Bradford, for Defendant-Appellant.

**Underwood, J.** The defendant was charged with the crimes of driving while under the influence of intoxicating liquor [DUI], 23 V.S.A. § 1201(a)(2), and disorderly conduct, 13 V.S.A. § 1026(1). He was found guilty by a jury on both counts, and filed timely appeals from the judgments thereon. As grounds for appeal the defendant claims, inter alia, that the trial court erred in not granting his motion for judgment of acquittal notwithstanding the verdict because (1) the law enforcement officer who arrested him did not request that he submit to a breath test, and (2) the State failed to prove the essential elements of disorderly conduct. We agree with the former contention but disagree with the latter. As such, we reverse the defendant's DUI conviction and affirm his disorderly conduct conviction.

Briefly stated, the facts are as follows. In Orange County, the sheriff's office and the local jail are each located in the sheriff's residence. On October 25, 1981, the defendant drove to this office in order to furnish bail for a friend. The sheriff observed the defendant drive into the parking lot from Route 113. The defendant drove forward and backed up three times before finally coming to a stop. The parking lot, which is thirty to forty feet wide and one hundred and ten feet long, was empty at the time.

The defendant and his young son entered the building. Once inside, the defendant grabbed the stairway bannister and put his hand on the wall to steady himself. He slowly made his way to the sheriff's office, staggering the whole way. When he reached the office the sheriff identified himself. The defendant showed the sheriff $500 and said he was there to bail out a friend. During the exchange, the sheriff smelled a strong odor of alcohol on the defendant's breath. He also noticed that the defendant's speech was slurred and his eyes were bloodshot.

When the sheriff asked the defendant what he was doing at the jail in his inebriated state, the defendant replied with profanity. The sheriff then told the defendant that he was going to process him for DUI. He asked the defendant to sit down, but the defendant refused to do so. The sheriff then sat him

down, but the defendant *immediately stood up.* This happened at least a dozen times. During this time the defendant kept making obscene remarks about the sheriff to his son.

Finally, the sheriff asked the defendant to empty his pockets. The defendant put the $500 bail money on the table. When the sheriff went to pick it up, the defendant attempted to bite his hand and started yelling further obscenities at him. The sheriff at that point decided to put the defendant in the lockup. In order to do so, he had to drag the struggling defendant into the cell.

At no time did the sheriff, who was certified to operate breath testing equipment, request that the defendant take a breath test, or explain to him that he had the right to have an independent chemical sample taken.

## I.

The defendant argues that the sheriff was under a duty to request a breath sample. He maintains that Vermont's implied consent law, 23 V.S.A. § 1202, imposes this obligation on the sheriff.

23 V.S.A. § 1202(a) first implies the consent of every operator to a breath test. Next, it implies the consent of every operator to a blood test if the operator is unable to give a breath sample, or if breath testing equipment is not reasonably available. Finally, it provides in pertinent part that:

> A sample of breath *shall* be taken only by a law enforcement officer who has been certified by the Vermont criminal justice training council to operate the breath testing equipment being employed *whenever* a state police officer or a law enforcement officer who has been certified by the Vermont criminal justice training council . . . has reasonable grounds to believe that the person was operating . . . any vehicle while under the influence of intoxicating liquor. (Emphasis added.)

The defendant submits that the words "shall" and "whenever" create a mandatory duty on the part of state police officers and law enforcement officers who have the proper certification to request a breath sample when they have reasonable grounds to believe a person was driving while under the influence of intoxicating liquor. We agree.

■■ When interpreting statutes, the rule is to give effect to the intent of the legislature. *Donoghue* v. *Smith,* 119 Vt. 259, 263, 126 A.2d 93, 96 (1956). The principal purpose of the implied consent law is to encourage the availability of scientific evidence of the presence or absence of alcohol in a person's blood. *State* v. *Mastaler,* 130 Vt. 44, 47, 285 A.2d 776, 778 (1971). "Essentially, the legislature has expressed its preference for the results of chemical analysis as a means to affirm or reject the uncertain opinion of a layman derived from observation of external symptoms of intoxication." *McGarry* v. *Costello,* 128 Vt. 234, 240, 260 A.2d 402, 405 (1969).

In order to effectuate this intent, the legislature enacted 23 V.S.A. § 1202 in 1970. The statute was subsequently amended in 1973, 1977, and 1981. The 1973 act read as follows:

> A sample of his breath or blood *shall* be taken *whenever* a state police officer, chief of police, or a police officer employed full-time by a town, city or incorporated village or sheriff has reasonable grounds to believe that the person was operating . . . any vehicle while under the influence of intoxicating liquor . . . . (Emphasis added.)

The meaning of this statute was plain on its face, and thus there was no need for construction. Rather, the courts were required to follow the statute according to its terms. *State* v. *Lynch,* 137 Vt. 607, 409 A.2d 1001 (1979). This Court did so in *State* v. *Welch,* 135 Vt. 316, 376 A.2d 351 (1977), where we held: "[T]he mandatory aspect of the word 'shall' as used throughout the Implied Consent Law concerns the duties of the investigating police officers. In those situations contemplated by § 1202 . . . the officers are required to make the request that the suspect operator submit to testing." *Id.* at 321, 376 A.2d at 354–55.

■ The 1981 amendment of § 1202 does not eliminate this requirement. All it does is require that the breath testing equipment be administered only by law enforcement officers who have been certified by the Criminal Justice Training Council. The legislature did not remove the word "shall" from § 1202. Hence, we must assume that the legislature acted with full knowledge of the construction given to said word in the *Welch* case. *Scott* v. *Saint Johnsbury Academy,* 86 Vt. 172,

175, 84 A. 567, 568 (1912). Thus, the statute as presently written still mandates that a test must be requested in certain instances, namely whenever a state police officer or a certified officer has reasonable grounds to believe that a person was driving while under the influence of intoxicating liquor.

■ In the instant case, the sheriff was properly certified and he had the requisite probable cause. Therefore, his failure to make the required request violated § 1202. As such, we are compelled to reverse, despite the fact that there is evidence to support the jury's verdict that defendant was guilty of driving while under the influence.

We hold that a violation of the "duty to request" rule is grounds for automatic reversal, since this is the only way that this Court can effectively carry out the legislative mandate set out in § 1202. Anything short of this harsh remedy would eviscerate the rule. In this regard, we note that suppression of evidence would not be an effective remedy to a § 1202 violation, because there is no evidence to suppress. The officer's failure to request a breath test does not produce incriminating evidence, but rather assures an absence of evidence.

The absent evidence, the breath test, may have been inculpatory or exculpatory. It will never be known which, because no test was requested. Therefore, a defendant can never show actual prejudice when an officer fails to request a breath test from him. Accordingly, we cannot require such a showing as a prerequisite to reversal. Rather, the fact that the absent evidence might have been favorable to the accused is sufficient for us to hold that the possibility of prejudice exists whenever § 1202 is not complied with. In light of all this, we must reverse defendant's DUI conviction and enter a judgment of acquittal as to that charge.

■ We note that this holding places no new burden on law enforcement agents. Section 1202 applies only to officers certified to administer a breath test. Those law enforcement agents not certified by the Vermont Criminal Justice Training Council to administer a breath test do not have an obligation under § 1202 to request a sample. Uncertified officers may still process suspects for violation of 23 V.S.A. § 1201(a)(2), driving under the influence, without requesting a breath sample. Under these circumstances, a prosecution could proceed

only under subsection (a)(2) and not under subsection (a)(1). We are not requiring the State to gather evidence for the accused. The legislature has spoken, and it is not our job judicially to amend the statute and thereby frustrate the legislative intent. If, as the legislature has indicated, chemical evidence is more reliable than clinical evidence to support an arrest and prosecution of a DUI suspect, then the State should be gathering chemical evidence to buttress the officer's claim of probable cause. If, coincidentally, the chemical test exonerates the DUI suspect, then the ends of justice are well served at the same time. The State should be just as interested in freeing the innocent as in convicting the guilty.

■■ In instances where it is impossible for a qualified officer either to make the request of the defendant to give a breath or blood sample, or to secure a breath or blood sample of a DUI suspect, the State should be free to proceed to prosecute the suspect in the same manner as if the defendant had refused to submit to testing, or as if there were no personnel or facilities reasonably available to obtain a sample of the defendant's breath or blood. It has long been the policy of this Court to avoid a construction of a statute "that will render the act ineffective or lead to irrational consequences." *Audette* v. *Greer*, 134 Vt. 300, 302, 360 A.2d 66, 68 (1976) ; *State* v. *Tierney*, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980).

The State is not limited to proceeding exclusively under 23 V.S.A. § 1201(a)(1) when it intends to make use of the results of a chemical test for blood alcohol in order to convict a DUI suspect. 23 V.S.A. § 1201(a)(1) states:

(a) A person shall not operate, attempt to operate, or be in actual physical control of any vehicle on a highway while :

(1) there is .10 per cent or more by weight of alcohol in his blood, or shown by analysis of his breath or blood ....

■ Under this statute the court will charge the jury that if the admitted evidence of the blood test result is .10 per cent or more by weight, it creates a permissive inference that the defendant was driving while under the influence of intoxicating liquor. If, however, the prosecutor elects to proceed under 23 V.S.A. § 1201(a)(2), which states:

(a) A person shall not operate, attempt to operate, or be in actual physical control of any vehicle on a highway while:

(2) under the influence of intoxicating liquor;

he cannot avail himself of the presumption he would be entitled to have raised under a prosecution pursuant to 23 V.S.A. § 1201(a)(1), even where the evidence admitted at trial demonstrates a chemical test equal to or in excess of .10 per cent by weight of alcohol in the blood. However, there is no restriction imposed by § 1201(a)(2) which limits the State's proof to just clinical evidence of DUI. The State may offer clinical evidence to further buttress the chemical test, or under certain circumstances only clinical evidence.

█ Finally the State always has the option to proceed under both § 1201(a)(1) and § 1201(a)(2) when it is relying on a chemical test, but the defendant can be convicted of only one of these offenses. *State* v. *Coulombe*, 143 Vt. 631, 633, 470 A.2d 1179, 1181 (1983).

## II.

The defendant next argues that the State failed to prove the essential elements of disorderly conduct. In this regard, he points out that he was charged with violating 13 V.S.A. § 1026(1), which states, in part, that:

A person who, with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof:

(1) Engages in fighting or in violent, tumultuous or threatening behavior . . . shall be imprisoned for not more than 60 days or fined not more than $500.00 or both.

The elements of this offense are (1) engaging in tumultuous behavior, and (2) doing so with the intent to cause public inconvenience or annoyance. *State* v. *Pickett*, 137 Vt. 336, 339, 403 A.2d 272, 274 (1979). The defendant submits that since the only people present during the incident in question besides himself were the sheriff, the defendant's son, and a prisoner in one of the cells, these elements were not met.

The defendant argues that the first element is not met because tumultuous behavior can only occur when a crowd of

people are present. While it is true that the word tumult may refer to the commotion and agitation of a large crowd, it has also been defined as a "violent outburst." *Webster's New International Dictionary* at 2733 (1961). A crowd of people is not the essence of a tumult. In any event, there were three persons privy to the defendant's outburst. This certainly would satisfy any "crowd" requirement.

 With regard to the second element, the defendant repeats his above argument. He maintains that since no members of the public were present, the intent to cause public inconvenience and annoyance was not made out. Once again, the defendant's argument is factually flawed. Members of the public were present. Even if this were not so, the defendant's argument would fail. Public is defined as a place "open to common or general use." *Webster's New International Dictionary* at 2005 (1961). A sheriff's office, without question, comes within this definition. Contrary to the defendant's contention, the word public refers to the place the tumultuous behavior occurred, not who was present at the time.

*Reversed as to the charge of driving while intoxicated and judgment of acquittal entered thereon; judgment affirmed as to the charge of disorderly conduct.*

Billings, C.J., concurring in part and dissenting in part.

I must dissent from the majority's reversal of the defendant's DUI conviction. I do not think the legislature, in enacting the implied consent law, intended to eviscerate 23 V.S.A. § 1201(a)(2), which before now allowed prosecution for driving while under the influence based on "[e]vidence of objective symptoms supporting the existence of that state." *State* v. *Jacques*, 130 Vt. 427, 430, 296 A.2d 246, 249 (1972). Today's decision bars any prosecution at all, notwithstanding the existence of probable cause, if the suspected drunk driver is stopped by a state police officer or certified law enforcement officer who does not ask the suspect to take a breath test. This contravenes the primary purpose of 23 V.S.A. § 1201; namely, the protection of the public from drunk drivers.

If an arresting officer reasonably believes a suspect is intoxicated, but the observable symptoms are few or subtle, then the evidentiary results of a chemical analysis are preferable if

prosecution is to be successful. But when, as in the instant case, the suspect is clearly intoxicated, to disallow a prosecution based on the multitude of objective symptoms exhibited by this defendant, merely because a chemical test was not offered, is unreasonable and unsound statutory construction. *Whitcomb* v. *Dancer*, 140 Vt. 580, 586–87, 443 A.2d 458, 461 (1982).

Peck, J., concurring in part and dissenting in part. I concur with the majority view affirming defendant's disorderly conduct conviction. I agree as well that the issue raised by defendant in appealing his DUI conviction must be resolved through a proper interpretation of 23 V.S.A. § 1202 (a). However, I am unable to agree with the narrow construction of this statutory subdivision relied on by the majority, through which, I believe, the legislative intent has been frustrated, and the power of law enforcement seriously curtailed. Accordingly, I dissent from the entry of judgment in favor of defendant on the DUI charge.

I am in full accord with the dissent filed by Chief Justice Billings. Nevertheless, I am, perhaps, even more disturbed by the majority opinion and its unfortunate consequences. Accordingly, I feel compelled to set forth at much greater length my own analysis of the true intent and purpose of the legislature in this companion dissent.

The majority finds the meaning of § 1202 to be plain on its face in granting suspects a right to be offered and, therefore, to be given a breath test if they so desire. In reaching this conclusion the majority first isolates, and then relies primarily on, a single sentence, in a single subdivision, of a single statute in the implied consent law contained in 23 V.S.A. chapter 13, subchapter 13. Going beyond this one sentence, the balance of the majority opinion is little more than an effort to explain away or mitigate the unfortunate consequences which flow from it. In my view, this is not proper statutory construction and, because of the consequences, it is particularly regrettable from the point of view of the true legislative intent as well as effective law enforcement.

Before a court relies on the plain meaning rule in construing a statute, it must examine and consider fairly, not just isolated sentences or phrases, but the whole and every part of the stat-

ute, *Town of Cambridge* v. *Bassett*, 142 Vt. 171, 177, 453 A.2d 413, 416 (1982) (citing *Harden* v. *Vermont Department of Taxes*, 134 Vt. 122, 124, 352 A.2d 685, 686–87 (1976)), together with other statutes standing in pari materia with it, as parts of a unified statutory system. *Rutz* v. *Essex Junction Prudential Committee*, 142 Vt. 400, 405, 457 A.2d 1368, 1370 (1983) ; *Emmons* v. *Emmons*, 141 Vt. 508, 512, 450 A.2d 1113, 1115 (1982). The true purpose of the legislature should be sought. *State* v. *Stewart*, 140 Vt. 389, 399–400, 438 A.2d 671, 676 (1981). The effects and consequences of a possible interpretation are of great importance, particularly so in the case at bar, and must be considered, *State* v. *Teachout*, 142 Vt. 69, 72, 451 A.2d 819, 820 (1982), and unfair, irrational or absurd consequences avoided if possible. *Whitcomb* v. *Dancer*, 140 Vt. 580, 586–87, 443 A.2d 458, 461 (1982) ; *In re J. S.*, 140 Vt. 458, 470, 438 A.2d 1125, 1130 (1981). Only when these rules have been incorporated into the construction process, and determined to have no impact, may it be said with any degree of certainty that the meaning of a statute or any part thereof is plain on its face. The failure of the majority to apply these principles here has resulted in an erroneous construction of § 1202, leading directly to discriminatory and burdensome consequences. In effect, the majority has changed the law to achieve a result it considers desirable, or to be what it thinks it ought to be rather than what it is. This is judicial legislation, a function which is never proper for the courts. *Marden* v. *Walton*, 142 Vt. 204, 207, 455 A.2d 321, 322 (1982). Legislation is the exclusive prerogative of our General Assembly, a separate branch of Vermont government.

## I.

It is appropriate to consider first the purpose of the so-called implied consent law (23 V.S.A. § 1202 et seq.). The majority points out correctly that in interpreting statutes the rule is that the intent or purpose of the legislature must be ascertained and given effect. *State* v. *Mastaler*, 130 Vt. 44, 50, 285 A.2d 776, 780 (1971). But this is so even though that intent may seem contrary to, and even conflict with, the letter of the statute. *State* v. *Baldwin*, 140 Vt. 501, 511, 438 A.2d 1135, 1140 (1981). It is the intent of the legislature which constitutes the law. *State* v. *Fox*, 122 Vt. 251, 254, 169 A.2d 356, 358 (1961).

Therefore, this Court is required to consider not only the letter of the law, but more importantly, its reason and spirit. *State v. Lynch,* 137 Vt. 607, 613, 409 A.2d 1001, 1005 (1979).

In *State v. Mastaler, supra,* this Court articulated two primary reasons for the legislature's 1959 enactment of Vermont's implied consent law. First, the "obvious purpose" is that of dealing with the problem of the person who drives a motor vehicle while he is under the influence of intoxicating liquor. *Id.* at 46, 285 A.2d at 778:

> Courts may take judicial notice of the problem . . . of the drunken driver on the highways with its ever increasing toll of injuries and death. . . . One reason for the adoption of those statutes was to promote public safety and welfare and to lessen, so far as possible, the danger to the public from intoxicated persons driving on the highways.

*Id.* at 47, 285 A.2d at 778 (citation omitted). Second, and in furtherance of the first reason, the law was designed to "encourage the availability of scientific evidence to determine the presence or absence of alcoholic influence in a person's body fluids . . . ." *Id.* at 47, 285 A.2d at 778–79.

There is nothing in the above statements of purpose to suggest, even remotely, any finding of a legislative intent to create a right in a suspect to take a breath test, or a duty on the part of the arresting authority either to request or to offer the test. Moreover, these statements of purpose in *Mastaler* are consistent with findings of purpose by other courts, having statutes similar to Vermont's, which have rejected the duty-to-offer argument. Thus, the Supreme Court of Kansas held:

> One of the purposes of the legislature . . . was to *augment existing methods* of establishing intoxication in criminal prosecutions for driving motor vehicles while under the influence of intoxicating liquors. [The statutes authorizing chemical tests] were enacted in 1955 *to assist law enforcement officials* in determining whether persons apprehended for driving motor vehicles while under the influence of intoxicating liquor were, in fact, in that condition at the time of their apprehension.

*State v. Barry,* 183 Kan. 792, 797–98, 332 P.2d 549, 554 (1958) (emphasis added).

The majority claims, in effect, that the purpose of § 1202(a) is to create scientific evidence. However, this begs the question in issue. It is a non sequitur to argue that such a purpose *requires* the State to create what it may not need for a conviction. Therefore, the effect of this reasoning is to say that the legislature intended to impose on the State a duty to collect evidence for a defendant, in short, to help him prepare his own case. This is an extremely novel suggestion. It has been generally rejected elsewhere and, in fact, it has been rejected in cases involving the identical issue presented here. "The State may not suppress evidence, but it need not gather evidence for the accused." *People* v. *Culp,* 189 Colo. 76, 79, 537 P.2d 746, 748 (1975) (quoting *State* v. *Reyna,* 92 Idaho 669, 674, 448 P.2d 762, 767 (1968)).

The majority evidently anticipated this objection and attempted to bury it by assigning it to legislature intent: "The legislature has spoken, and it is not our job judicially to amend the statute and thereby frustrate the legislative intent." I think the answer to this argument is obvious: again, it begs the very question to be resolved; it is analogous to defining a word by using the word itself. The fundamental or underlying basis of this dissent is that the legislature has *not* spoken to produce the result embraced by today's holding. It is the majority that is requiring the State to collect evidence for the defendant, not the legislature. It is the majority who frustrates the true legislative purpose. Moreover, the sentence contained in the same paragraph of the majority opinion, that "[t]he State should be just as interested in freeing the innocent as in convicting the guilty," has a strange ring to it in view of the gross discrimination against certain classes of DUI suspects (discussed hereafter in this opinion) created and condoned by the majority's interpretation of § 1201(a). Clearly, the majority gives short shrift to unfairness and discrimination as a serious factor in statutory construction.

In view of the above, it is my view that the underlying and primary purpose of the implied consent law is as set forth in *State* v. *Mastaler, supra*; in short, to augment and strengthen the previously existing legislation against drunk driving, not to qualify or limit it. It is intended to be an additional resource available to the State in its efforts to eliminate drunken drivers and the toll of injuries and death and human suffering that fol-

lows in their wake along our highways. All other purposes supplement this underlying purpose. There is nothing in § 1202, when properly examined in its entirety and in the light of those statutes which stand with it in pari materia, to suggest a legislative purpose or intent in accordance with the majority view.

## II.

Turning next to the construction process itself, I am of the view that one of the errors of the majority in its interpretation of § 1202(a) lies in its failure to examine not only this subdivision in its entirety, but the whole statute (§ 1202) as well, contrary to the rule that the whole and every part of a statute must be examined. *State* v. *Tierney*, 138 Vt. 163, 165, 412 A.2d 298, 299 (1980).

It is true that when a statute is plain and unambiguous on its face there is no need for construction and it must be enforced according to its terms. *Riddel* v. *Department of Employment Security*, 140 Vt. 82, 86, 436 A.2d 1086, 1088 (1981). Admittedly, this is so even if the statute seems unfair; the remedy in such instances lies with the legislature, not the courts. Nevertheless, the majority assertion that the meaning of § 1202(a) is plain is hardly the case. At the outset of course, as noted above, this conclusion is encased in a tissue-thin wrapping of a single isolated sentence, considered in a vacuum without any reference to the whole of that subdivision, the remaining subdivisions of § 1202, or statutes in pari materia with it.

Section 1202(a) is ambiguous; patently so. Even accepting, arguendo only, that, standing alone, the one sentence relied on by the majority can be construed to mean what is claimed for it, i.e., that a breath test *must* be offered, the uncertainty within subdivision (a) lies in the incompatibility of the word "request" on the one hand, which is made implicit by the word "consent," and the words "offer" or "duty to offer" (a breath test) on the other. In general parlance, and more specifically, within the context of § 1202(a), "request" and "offer" are not synonyms; in fact they are inconsistent; they do not mean the same thing.

It would not alleviate this uncertainty to say that the duty is not to *offer* but to *request*. Such an argument would be

clutching at semantics; if there is a duty to request, that duty translates into, and is indistinguishable from, a duty to offer on the one hand, and right to take on the other. It is the same thing couched in different terminology. And this clear ambiguity leads to further speculation as to whether, after all, the "shall be given" language refers to officer qualification or to the subsequent "whenever." Regardless of this, however, subdivision (a) is clearly not "plain on its face" when considered in its entirety. At best its meaning is uncertain and, therefore, ambiguous. This justifies, and in fact mandates, resort to the process of statutory construction.

The implied consent (subject to the right of refusal) imposed by the first sentence of § 1202(a) is not only an integral part of the statute, it is its very *raison d'etre*. It follows that the remaining parts must be read in conjunction with, and not isolated from, this initial provision. When the first and final sentences are read together, it is clear that the phrase "the sample shall be taken" refers to the qualifications of the officer, i.e., shall be taken by a certified officer, and becomes operative *after* a test has been requested and the suspect's consent has been given, *if*, that is, "whenever" the officer has reasonable grounds to believe the suspect was operating a vehicle under the influence of intoxicating liquor.

Thus, construing § 1202(a) in its *entirety*, the test *may* (not *must*) be given when four conditions precedent are satisfied. First, the suspect must be the apparent operator. Second, the officer must have reasonable grounds to believe the suspect is under the influence of an intoxicant. Third, the suspect has been *requested* to take the test; clearly, the operative word implied is "requested" not "offer" or "right to take." Consent to take a test necessarily implies a preliminary request to do so. The word "request," as applied to something that one person asks of another, is inconsistent with an "offer" by the former to the latter. Fourth, the suspect must consent to the test.

The remaining subdivisions of § 1202 may have little to do with the issue here. Nevertheless, the opening language of § 1202(c), "[a] person who is *requested* . . . to submit to a test . . . ." (emphasis added) is more consistent with the construction outlined above, than with that of the majority. At least, it weakens even further the plain meaning argument applied to subdivision (a). Subdivision (c) refers to a person

who is *requested* to submit to an evidentiary test, not to one who has been offered a test. This suggests that a request is not mandatory and, again, there is a wide gap in meaning between the word "request" and the word "offer." It is significant that nowhere in § 1202, in any other statute in the implied consent law, or elsewhere, are the words "offer," "right," or "right to take" found with reference to the breath test. If it was the intent of the legislature to mandate an *offer* of a test, it would seem that subdivision (c) would be worded in terms of a person to whom a test has been offered, rather than in terms of one who has been requested to submit to testing.

A further weakness in the majority view lies in its assumption that the legislature intended to discriminate among suspects. I cannot subscribe to any such intent. Thus, under § 1202(a), the breath test *"shall* be given" by an officer who has been certified by the Criminal Justice Training Council as qualified to give the test. Combining this limitation on officer eligibility, with the requirement imposed by the majority that the test be offered, together with the additional fact that there is a sizeable corps of uncertified deputy sheriffs in Vermont, particularly in rural areas, the discrimination becomes manifest. The majority holds that it is only when the officer is certified that the test must be offered. The opinion then concludes that, in those cases where the officer is not certified, the suspect does *not* have a right to a breath test, and may be prosecuted under § 1201(a) (2) ; that is, solely on the basis of observation and the detection of clinical symptoms. It can be seen, therefore, that the majority decision has created two classes of suspects in DUI cases, granting rights to one class that it denies to the other. It is a matter of sheer chance whether a suspect is processed by an officer who is qualified to give the breath test, or by one who is not.

The decision argues that one of the purposes of § 1202 is to create evidence. Based on this assertion, the majority complains that without a breath test the legislative intent will be frustrated since there will be "an absence of evidence." This is a perplexing argument. Notwithstanding the novelty of the view that the legislature intended to impose on the State an obligation to collect evidence for a defendant, the majority expresses concern that in the instant case the breath test might have proved exculpatory, farfetched as this is in the light of

the overwhelming evidence of intoxication. It is puzzling to me, nevertheless, that there is not a similar concern for the hapless suspect who falls into the hands of an officer who is not certified. A test in the latter case might also prove exculpatory, yet the former now has the right to be offered and to take a breath test, while the same right, involving an identical offense, is denied to the latter. This does not appear to bother the majority. Justification for this discriminatory treatment, particularly as representing legislative intent, is not made clear. It is contrary to the rule cited above that, if possible, statutes will not be construed to produce an unjust or unfair result. *Whitcomb* v. *Dancer, supra.*

It should be noted also that under 20 V.S.A. § 2358(d) elective enforcement officers are not required to attend the state's law enforcement training program (where the required certification may be earned). Accordingly, constables and even county sheriffs may not, in particular cases, be certified to give the breath test, thus adding to the ranks of those officers under whose control a DUI suspect is denied rights granted to others. By virtue of the fact that certification for breath testing is earned by some, but not necessarily all, of the officers attending the council program, 20 V.S.A. § 2358(d) is in pari materia with 23 V.S.A. § 1202, and should therefore be considered with other factors in construing the latter statute. The majority has not done so.

Considering still another aspect of § 1202(a), the majority view attributes a further inconsistency to the legislative intent as far as suspects' rights are concerned, even when an officer qualified to give a breath test is present. The decision states that a breath test *must* be offered in such situations, but this subdivision reads in part:

> If breath testing equipment is not reasonably available or if the person is unable to give a sufficient sample of his breath for testing . . . he is deemed to have given his consent to the taking of a sample of his blood for those purposes.

Notwithstanding this provision, there is no language, comparable to that in the same subdivision relating to the breath test (as construed by the majority), imposing a duty or obligation on law enforcement officers to "offer" a blood test when

breath testing equipment is not available, or when the suspect is unable to provide a breath sample. The right to a blood test arises only if the suspect consents to testing. § 1202(c). There is no duty to offer, or right to take, a blood test in the first instance. Thus, if breath testing equipment is available, a suspect has a right, according to the majority, to be offered and to take the test; if it is *not* available, there is nothing anywhere in the law giving another suspect a right to be offered and to take a blood test, which might also prove exculpatory. This is not only inconsistent, it is discriminatory.

Finally, there may be many situations in which it will be impossible either to offer or to give a breath test even though there may be a qualified officer involved. For one reason or another, including weather conditions or responsibilities at an accident site, it may not be possible to transport a suspect to a station where the test can be given while it is still timely and meaningful. A suspect may elude pursuit and not be apprehended until much later, when any test, breath or blood, would be meaningless, notwithstanding the fact that the clinical evidence against him may be overwhelming. The majority has effectively deprived the State of much of its power to prosecute for DUI under 23 V.S.A. § 1201(a)(2), with a consequent burdening of the enforcement effort.

### III.

An examination of statutes in pari materia is recognized as essential to the construction process when that is conscientiously undertaken.[1] I believe the majority may also be faulted for its failure to give any consideration to this rule before deciding that § 1202(a) is plain on its face.

I have already noted my view that 20 V.S.A. § 2358(d) impacts on § 1202 of Title 23, and thus the two are in pari materia. Nevertheless, the statute which is the most seriously and adversely affected by the majority decision is, unquestionably, 23 V.S.A. § 1201, more particularly § 1201(a)(2).

---

[1] Among recent cases in which this Court employed the pari materia rule to overcome the effect of a single statute otherwise plain on its face are *In re Town of Springfield,* 143 Vt. 483, 469 A.2d 375 (1983); *State v. Lynch, supra.*

Before today's decision it has been understood generally that subdivision (a) of § 1201 creates two separate motor vehicle offenses relating exclusively to alcohol and driving, neither one dependent upon, or limited by, the other. 23 V.S.A. § 1201(a)(1), (a)(2).[2] First, under § 1201(a)(1), a suspect could be charged and convicted of operating a motor vehicle while "there is .10 per cent or more by weight of alcohol in his blood, as shown by analysis of his breath or blood." Secondly, under subsection (2) of subdivision (a), a person who operates a motor vehicle on the highway, could be charged and convicted if the operation occurs while he is "under the influence of intoxicating liquor." Under (2) the State had, until today, the recognized option to build its case exclusively on the so-called clinical observations of the suspect: staggering, odor, coordination or the lack of it, speech, atypical conduct and the like.

Considering that § 1201(a)(1) contemplates a prosecution based on chemical testing of blood or breath that is not within the contemplation of § 1201(a)(2), and that § 1202 relates to chemical tests and the implied consent thereto, I submit it is reasonably clear that the purpose of § 1202 is to implement § 1201(a)(1) exclusively and has no application or relation to cases brought only under § 1201(a)(2) where no testing is involved. Whatever rights a defendant may or may not be granted under § 1202(a), they are intended to apply only to cases in which the State seeks to obtain a conviction under § 1201 (a)(1).

Driving "under the influence," as a criminal offense, has a long history in this state and throughout the nation. In recognizing DUI as a criminal offense, per se, we have in the past, with the single exception discussed in section VI of this dissent, made no allusion to its being affected, limited, or eliminated by virtue of the more recent chemical tests, breath or blood, and certainly not by virtue of any language in § 1202(a). As recently as 1982, we stated:

> The meaning of "under the influence" was developed in our cases at a time before the use of chemical tests of any kind. Its relevance has always been to physical manifesta-

---

[2] 23 V.S.A. § 1201(a)(3) creates a third offense applicable to driving under the influence of drugs or a combination of drugs and alcohol.

tions capable of observation by a witness and reported by testimony. To support a claim of "under the influence" requires observable behavior indicating a loss of full control over the faculties of mind and body . . . . With this a witnessed fact, the measure of that loss is not material, and the violation of *that portion of the statute*[3] is sufficiently established.

It is important for the trial court to see that this charge on "under the influence" be applied only in cases where testimony supports a claim of loss of control of physical and mental faculties, and not where the evidence deals solely with the chemical level of alcohol. *But the proposition that the legislature has retreated from the position that it is impermissible to operate a motor vehicle with impaired mental or physical faculties due to alcohol is unacceptable.*

*State* v. *Carmody,* 140 Vt. 631, 638, 442 A.2d 1292, 1295–96 (1982) (emphasis added).

This language is preceded by a statement *rejecting* the position of the defendant in that case "based on the statutory enumeration [in 23 V.S.A. § 1201(a)] of *three grounds upon which conviction can be based." Id.* at 637, 442 A.2d at 1295 (emphasis added).

It is difficult to imagine a more definitive recognition by this Court that the offense of driving under the influence, established by clinical observations alone (as described in *Carmody*), remains, as it always has been, a separate and fully viable alternative basis for prosecution, not impaired, weakened or eliminated by the ambiguities of § 1202.

In support of its position, the majority points to our dicta in a 1969 case saying that, in enacting the implied consent law, the legislature "expressed its preference" for scientific evidence of intoxication over opinion evidence derived from observation by lay witnesses. *McGarry* v. *Costello,* 128 Vt. 234, 240, 260 A.2d 402, 405 (1969). Assuming this to be so, how it is relevant, or provides any support for the proposition that a breath test *must* be requested (i.e., "offered") escapes me entirely. Again, it is a non sequitur; the one has no relation to the

---

[3] Referring to 23 V.S.A. § 1201(a)(2).

other. A mere preference does not give rise to a mandate of exclusivity without reading into the statute something that is not there.

The statutory authority to prosecute for being "under the influence" (alone) has been in existence continuously in Vermont since 1906 (see P.S. § 4090, 1906). With the later development of chemical testing to determine blood alcohol content, the implied consent law was enacted in recognition of testing as a separate and perhaps even a preferred evidentiary tool available to law enforcement authorities. However, the alternative, and formerly exclusive statutory basis for prosecution, "while under the influence of intoxicating liquor," without more, was *reenacted* in identical language by § 1201(a)(2). This subsection is separate from § 1201(a)(1), and there is simply no logical reason to conclude that the legislature ever intended to limit or qualify its usefulness as wholly independent of (a)(1) ; that is, an offense, per se, that provides an alternative basis for prosecution. Its continuation as a separate statutory subsection is a strong indication of that intent. The legislative motivation in enacting § 1201(a)(1) was to provide law enforcement with what was visualized as a new and more accurate evidentiary tool, not to make it exclusive or to make it more difficult to prosecute for alcohol related motor vehicle offenses. Section 1201(a)(1) is no more than an option. Section 1202, and the other statutes that relate to testing, become operative only when that option is selected.

The provisions of 23 V.S.A. § 1204 also impact on the construction of § 1202, and are, therefore, also in pari materia. Under § 1204(a) certain presumptions are generated by specified percentages "by weight of alcohol in the person's blood," as determined by analysis of a breath or blood sample. One of these presumptions, § 1204(a)(1), favors the suspect, and (a)(2) may or may not aid him. Thus, once more, the discriminatory aspects of the majority opinion become manifest. A suspect who is processed by an officer who is not certified to administer the breath test cannot, of course, claim the benefit of the provisions of § 1204(a)(1) even though a test might have resulted in a presumption that he "was not under the influence of intoxicating liquor." On the contrary, such a person must face all the risks of a trial which might not otherwise have occurred at all. Surely the legislature never intended this unjust

discrimination between classes of suspects, and I reject the majority's implied assumption of such an intent.

Finally, § 1204(c), read in the light of both § 1201(a)(2) and § 1202(a), demonstrates beyond any fair question that driving under the influence alone (§ 1201(a)(2)) was intended to remain a fully viable alternative available to the State as a basis for prosecution, and that the legislature never intended to require that a breath test *must* be offered under *any* circumstances. This subdivision provides in part that the provisions of § 1204 are not to "be construed as requiring that evidence of the amount of alcohol in a person's blood . . . must be presented." To hold that the evidentiary breath test must be offered, when there is no corresponding obligation to present the results into evidence, particularly if it is favorable to the accused, seems absurd on its face. The majority is saying that § 1204(c) authorizes the suppression of evidence and the violation of a prosecutor's obligations to present all of the evidence known to him. I cannot accept that proposition. In similar circumstances, under a statute analogous to § 1204, the Supreme Court of Colorado said: "We believe this language negates the defendant's claim that he must be advised of the existence of the Implied Consent Law." *People* v. *Culp, supra,* at 78, 537 P.2d at 747.

I conclude that the majority has failed to give proper consideration to the statutes standing in pari materia with 23 V.S.A. § 1202 that are essential to a correct interpretation. As a result of that failure the majority has reached and promulgated a result contrary to the intent of the legislature.

## IV.

Decisions by courts of other jurisdictions are not, of course, binding on this Court. Nevertheless, I am concerned that the majority has not seen fit to investigate this source of information; it would have proved instructive. As far as I can determine the majority decision isolates this Court as the only one reaching the "mandatory offer" conclusion under state statutes similar to our own. *Every* state decision discovered, including those cited herein, which considered this question, has expressly rejected the conclusion reached by the majority here.

The Supreme Court of Colorado rejected the right-to-take

construction of that state's statute, which reads in pertinent part:

> The test *shall* be administered at the direction of the arresting officer *having reasonable grounds to believe the person to have been driving a motor vehicle under the influence* of, or impaired by, alcohol . . . . (Emphasis added.)

Colo. Rev. Stat. § 42-4-1202(3)(b) (1973).

The Court held:

> The arresting officer, in the first instance, has the right to invoke the implied consent law by requesting the driver to submit to a chemical test or face revocation of his license. Alternatively, the officer may arrest the driver without invoking the statute and the prosecution thereafter may attempt to establish intoxication by means other than the statutory presumptions. The implied consent law neither requires the arresting officer to request a chemical test nor does it grant the driver an independent right to a test . . . .

*People v. Gillett,* — Colo. —, —, 629 P.2d 613, 617 (1981).

The Supreme Court of Kansas reached the same result under a statute providing that whenever the officer has reasonable grounds to believe that a person was driving under the influence of intoxicating liquor "[t]he test *shall* be administered at the direction of the arresting officer." (Emphasis added). The Court held:

> We find nothing in the foregoing enactments to evidence legislative intent requiring that the chemical tests therein authorized must be offered, given or refused in every case where an arresting officer apprehends the driver of a motor vehicle on a charge of operating that vehicle while under the influence of intoxicating liquor. Moreover when they are reviewed in their entirety, and examined in the light of the purposes for which they were enacted, along with matters of common knowledge of which we take judicial notice, we are convinced their terms are not to be construed as contemplating or requiring that provisions thereof, authorizing the giving of chemical tests, be re-

garded as mandatory or that the giving of such tests, absent refusal to submit thereto, is prerequisite to a prosecution for, and valid conviction of, the offense of driving a motor vehicle while under the influence of intoxicating liquor . . . .

*State* v. *Barry, supra,* at 798, 332 P.2d at 554.

Likewise, the Supreme Judicial Court of Maine held, inter alia, in a short per curiam opinion, that: "Failure to offer a test does not preclude conviction under the statute." *State* v. *Sawyer,* 382 A.2d 1051, 1052 (Me. 1978).

In my view, the interpretation of legislative intent to be found in the decisions of other courts is far better reasoned than the construction promulgated by the majority decision in the instant case. These cases say, in effect, that the implied consent law is intended to provide enforcement officers and prosecutors with an easily administered, reliable means for proving intoxication in DUI cases.

However, this does not mean that the state has to offer a chemical test but only that the state must prove intoxication by other methods (under the statute). Chemical tests are neither necessary nor required to prove intoxication.

*People* v. *Culp, supra,* at 78, 537 P.2d at 748 (citations omitted).

## V.

The majority suggests that a prosecutor is not precluded from bringing his case under 23 V.S.A. § 1201(a)(2), even though a breath test is offered and given, with a .10 or higher result. The prosecutor may *elect* to proceed under (a)(2) alone if he chooses to do so. The only thing the prosecutor surrenders in making such a strange choice is the statutory presumption that the defendant was driving under the influence of intoxicating liquor. In my view this is small consolation for the loss of (a)(2) as a fully viable, independent alternative, and preposterous almost on its face. More significant, however, it is absurd to postulate that any conscientious prosecutor will voluntarily elect to waive away a presumption which operates so strongly, and in many instances all but conclusively, in the State's favor for no other reason than to be in a position to

proceed solely under the weaker of two statutory alternatives. The mere statement of this is sufficient to demonstrate that this "right" is meaningless, absurd, and militates against the majority's construction of the statutes as representing any possible legislative intent.

## VI.

The only "authority" relied on by the majority for the conclusion that a breath test must be offered is a short statement appearing in *State* v. *Welch,* 135 Vt. 316, 321, 376 A.2d 351, 355 (1977), that § 1202 requires an officer "to make the request that the suspect operator submit to testing." However, an examination of *Welch* shows clearly and immediately that this statement is not authority for anything. The majority simply fails to distinguish between dictum and law. The statement in *Welch* has nothing whatever to do with the sole issue presented for review in that case: appellant's right to consult an attorney prior to giving consent to a breath test. *Id.* at 317–18, 376 A.2d at 352. It was not a statement of law presented and deliberately passed on by this Court. It was no more than an expression, originating alone with the author, as an argument or illustration; as such, it was merely obiter dictum. *Derosia* v. *Ferland,* 83 Vt. 372, 381, 76 A. 153, 156 (1910). As obiter dictum it lacks the force of law or of a holding of this Court. Moreover, it does not, and indeed cannot, claim support to be found in any prior or subsequent decision of this Court until today, or of any other court that I have been able to find.

Further, even considered as an interpretation of § 1202, this statement in *Welch* is subject to the same comments applied to the majority opinion throughout this dissent relating to proper statutory construction; is too narrow and limited.

In my judgment, *Welch* provides no authority for the decision of the majority here. It is unfortunate that it has been relied on for that purpose. It is simply wrong regardless of its status as a legitimate precedent, and has led the majority to perpetuate the earlier error by relying on it as support for today's decision. Its influence on the majority is manifestly great, but entirely disproportionate to its actual merit.

## VII.

The majority continues to pile error on error in holding that

the failure to request "is grounds for automatic reversal, since this is the only way that this Court can effectively carry out the legislative mandate set out in § 1202." This holding illustrates the consequences that can follow such a limited exercise in statutory construction.

By holding that failure to offer the breath test is reversible error, per se, the majority exacerbates the discriminatory aspects of its decision. Thus, a suspect to whom the breath test must be offered, in accordance with the majority opinion, is entitled to an automatic acquittal if the offer was not made, whereas another suspect to whom the test need *not* be offered, because he had the misfortune to be processed by an unqualified officer, or for any other reason, must stand the full risks of trial and possible conviction. If a test had been available it might have been as inculpatory or exculpatory as any test actually given another suspect; to quote the majority's own words: "It will never be known which," because the law itself denies him a right and a protection that it grants to others in a more fortunate situation. If this is not unjust discrimination, I must have a serious misunderstanding of these terms.

Finally, the caveat that the failure to offer a breath test entitles a defendant to an automatic acquittal ignores well established rules applicable to cases in which fundamental constitutional rights are not involved.[4] The Supreme Court of the United States, and this Court as well, have recognized that even rights guaranteed by the United States Constitution, the most fundamental law of this country, *may* yield before the totality of the facts and circumstances of a particular case, including overwhelming evidence of guilt, rendering any error "harmless." *United States* v. *Hasting,* 461 U.S. 499, 103 S. Ct. 1974 (1983); *Chapman* v. *California,* 386 U.S. 18 (1967); see also *Rutz* v. *Essex Junction Prudential Committee, supra; State* v. *Patnaude,* 140 Vt. 361, 438 A.2d 402 (1981). Today's decision ignores and excludes this doctrine from consideration in future cases in which it will have clear application. Holding that the failure to offer a breath test results in an automatic acquittal in *all* cases *regardless* of the evidence of guilt is unjustified and incomprehensible; it is not only an unnecessary

---

[4] There is no constitutional right to a breath test. *People* v. *Culp, supra,* at 78, 537 P.2d at 748.

result, it weakens and burdens law enforcement in its efforts to control drunk driving and its appalling consequences by severely limiting the availability of § 1201 (a) (2) as the viable prosecutorial alternative it has always been until today.

The case before us is a classic example of an instance in which simple common sense would lead other courts to apply the "totality" doctrine. Every observable symptom of advanced intoxication was present: odor, speech, grossly aggressive, combative and offensive conduct and language, and the like. Nor is there any doubt that defendant operated a motor vehicle while in that condition. All the elements necessary to prove the offense of "driving under the influence" under § 1201 (a) (2) were demonstrated; the evidentiary symptoms were overwhelming. Moreover, no claim was made that defendant was ill or tired, nor was any other satisfactory explanation offered to account for his apparent drunkenness. To say, in the face of the evidence, that the test might have been exculpatory is pure rationalizing to circumvent the obvious. The majority virtually concedes that defendant was intoxicated and had been driving while in that condition, thus emphasizing and exalting the extremely technical aspects of the result. Defendant was clearly under the influence while driving; that was the underlying issue. Accordingly, no prejudice resulted and the totality doctrine should be applied. It is one thing to free the innocent, it is quite another to permit those who break the law and jeopardize the public safety to escape the consequences of their actions through the judicially created loophole of a technicality when there is a total absence of prejudice, as in the instant case, and no fundamental right has been violated.

I agree with the Chief Justice that the DUI conviction should be affirmed.