OPINION OF THE COURT
Peggy Davis, J.
Nine television, radio and print news organizations have sought leave to observe the fact-finding hearing (trial) which will determine whether this nine-year-old respondent committed acts which would have been criminal had he committed them as an adult. Counsel for respondent sought, and was granted, a public arraignment, but has requested that the trial be closed.
I. THE CONSTITUTIONAL CONTEXT
The Supreme Court of the United States has determined that the closing of criminal trials — which have tradition *428 ally been open to press and public — “without *** demonstration that closure is required to protect the defendant’s superior right to a fair trial, or that some other overriding consideration requires closure” (Richmond Newspapers v Virginia, 448 US 555, 564), violates the First Amendment (supra, at pp 580-581).[1] However, the holding of Richmond Newspapers is limited to “the trial of a criminal case” (supra, at p 581), and to those situations in which closure is not warranted by a legitimate and overriding interest.[2] Given the deliberate precision of the Richmond Newspapers holding and the court’s recent acknowledgments of the special need for confidentiality of juvenile proceedings (Matter of Gault, 387 US 1, 24-25; McKeiver v Pennsylvania, 403 US 528, 550; Davis v Alaska, 415 US 308, 319; Smith v Daily Mail Pub. Co., 443 US 97, 107), there is every reason to assume that selective[3] xclusion of press and public from juvenile delinquency proceedings is constitutionally permissible. Indeed, selective or blanket exclusion has been authorized by most of the 50 States.[4] r[5]
II. APPLICABLE STATE LAW
In New York delinquency proceedings, uniform, Statewide rules of court (enacted pursuant to section 212 of the Family Court Act and section 28 of article VI of th“e New York Constitution and specifically authorized by subdivi *429 sion [b] of section 741 of the Family Court Act)[6] serve as guides by which the presiding Judge must exercise discretion to permit or deny access to delinquency proceedings.
They provide, in relevant part, that “a representative of the news media” or a person “engaged in bona fide research or writing involving the work of the court” may be admitted after consideration of (1) the likelihood of disruption in the proceedings; (2) any objections of parties to the proceedings; (3) whether the applicant agrees to respect the privacy of the proceedings by avoiding dissemination of “information likely to identify the parties or any witness;” (4) whether the applicant “has disregarded the privacy of any proceedings in the Family Court” in the past; and (5) whether “orderly and sound administration of justice requires that all observers be excluded from the courtroom.”
Richmond Newspapers teaches that the court’s discretion must be exercised with concern that judicial processes be, wherever possible, checked by public scrutiny and influenced by public participation and debate. The purposes and traditions of the juvenile court dictate that the court’s discretion be exercised with concern that the delinquency proceeding be administered (1) to avoid for one who has the defense of infancy the stigma attached to defense or conviction of “criminal” charges[7] and (2) to assure, to the extent possible, that the young person’s experience with the law is constructive and rehabilitative. To say this is not to urge informality or relaxation of respondent’s due process rights at the fact-finding stage. The exercise of Family Court jurisdiction involves an interference with the liberty and autonomy of young citizens and their families which must not occur without a rigorous test of the alleged basis *430 for intervention. It is possible, however, to protect the respondent’s due process rights without subjecting him to unwanted public attention. Moreover, regardless of the wishes of the accused, it should be possible to provide adequate due process protections against unwarranted court intervention without opening the proceeding to public attention which will convey to an immature respondent an impression of celebrity rather than solemnity[8] or impede readjustment to family and community life.[9]
III. DETERMINATION
With the duty to protect both the public’s right to know and the best interests of the child respondent, we consider the factors set forth in section 2501.2 of the Uniform Family Court Rules (22 NYCRR 2501.2) in light of the particular facts of this case.
Two of the five factors the court is required to consider relate to its ability to protect the parties against public identification. In this case no such protection is possible. First, the respondent has been identified and pictured in news reports, and coverage of the alleged incident has been extensive. Moreover, only two of the nine news organizations applying for admission to this trial have agreed to stipulate in accordance with subdivision (c) of the rule (22 NYCRR 2501.2), that they will not “make any public or private report or news account of any proceedings in the Family Court which shall contain the names or the addresses, or photographs, drawings, tape recordings or other *431 representation or reproduction, or any other information likely to identify the parties or any witnesses.”[10] Although an order conditioning admission upon compliance with subdivision (c) may be enforceable, the matter is subject to question in view of the Supreme Court’s admonition that although a trial court is “permitted in certain circumstances to close pretrial proceedings to the public * * * such an option [does] not allow the trial judge to suppress publication of information from the hearing if the public was allowed to attend” (Oklahoma Pub. Co. v District Ct., 430 US 308, 311; see, also, Smith v Daily Mail Pub. Co., 443 US 97, supra).[11] Thus, on the one hand, any attempt to avoid identification would be meaningless. On the other hand, any undisclosed facts revealed at trial are likely to be widely disseminated in articles which identify, or recall prior identifications of, respondent and his family.[12]
In considering whether press access will create a risk of disruption or interfere with the orderly and sound administration of justice, the court must be mindful of the special heeds to protect the child and his family from unwarranted stigma and to facilitate any rehabilitative measures which might be deemed necessary in the event of a finding of delinquency. In a proper case, the need to preserve a sense of privacy and decorum in the courtroom can be met by permitting press access on a pool basis. In the absence of evidence that the child or his family is particularly vulnerable or that the issues involved are particularly sensitive, this device might provide the means to protect the right of the public to be informed without sacrificing the principles of the Family Court Act. However, in this case, involving an unusually young respondent, the court must be scrupu *432 lous in its effort to avoid “the harmful impact publicity may have on the rehabilitation of a child.”[13]
The final consideration is the objection of counsel for respondent to press access. At this stage of the proceedings, the child’s lawyer should be far better situated than the Trial Judge to know what is in the boy’s best interests. He has presumably discussed the matter with the boy and his family and has, through discovery and other trial preparation, developed a sense of the nature of the evidence on both sides. His judgment that closure is in the boy’s best interest must therefore be given great weight despite his earlier, contrary position.
In view of the court’s inability to shield the respondent and his family from public identification in connection with any damaging or sensitive facts that may be revealed at trial; the respondent’s extreme youth; and the position of his attorney, apparently supported by respondent and his family, the applications of news representatives to attend the trial are respectfully denied and the clerk of the part is. directed to admit only the parties, their counsel and witnesses and necessary court personnel.[14]

. Although the principal opinion, cited above, received the support of only three Justices, the principle set forth above was accepted by each concurring Justice (concurring opn of Justice Brennan, at p 584; concurring opn of Justice Stewart, at p 598; and concurring opn of Justice Blackmun, at p 601).
New York State constitutional requirements are similar. Indeed, the New York Court of Appeals gave earlier recognition (by somewhat different reasoning) to a qualified right of access to court proceedings (see Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 437-438).

. Indeed, the plurality invites comparison to Wigmore, Evidence ([Chadbourn rev, 1976], vol 6, § 1835) in noting that there are “circumstances in which all or parts of a criminal trial may be closed to the public” (supra, at p 581, n 18). In section 1835, Wigmore notes that privacy in juvenile cases is “regarded as generally useful and occasionally essential”, and is usually provided by statute.

. As the following discussion indicates, the New York legislative scheme does not raise the question whether a State may determine that a protective policy toward children justifies automatic closure or closure at the sole option of the respondent.

. (See Smith v Daily Mail Pub. Co., 443 US 97, 105, supra; McGlaughlin and Whisemand, Jury Trial, Public Trial and Free Press in Juvenile Proceedings: An Analysis and Comparison of the IJA/ABA, Task Force and NAG Standards, 46 Brooklyn L Rev 1, 10-11.)

. In view of respondent’s position, we do not reach the difficult question whether an alleged delinquent has a right to a public trial.

. A previously enacted local rule giving the New York City Family Court Administrative Judge discretion in this matter was superceded by the uniform rule in keeping with the requirements that “[t]o to the extent practicable, any rule of court prepared under [the Family Court Act] apply uniformly throughout the state of New York” (Family Ct Act, § 212), and that regulations by individual courts be “consistent with *** general rules” (NY Const, art VI, §30).
Similarly, the more recently enacted subdivision (b) of section 741 of the Family Court Act overrides section 4 of the Judiciary Law as a statement of legislative will with respect to delinquency proceedings.

. This is appropriate in view of the fact that “the difference between crime and delinquency is often as great as the difference between childhood and adulthood,” (Erikson & Eriskon, The Confirmation of the Delinquent, 10 Chicago Rev 15, 22 [winter, 1957]).

. The initial reaction of many juveniles to media attention is “a sense of‘importance’ ” (Howard, Grisso and Neems, Publicity and Juvenile Court Proceedings, 11 Clearinghouse Rev 203, 209). Indeed, it has been said that “newspaper publicity provides delinquents with precisely the response they are seeking, since by delinquent behavior they are trying ‘in inverted fashion’ to prove their worth.” (Geis, Publicity and Juvenile Court Proceedings, 30 Rocky Mountain L Rev 101, 112, quoting Elkin, English Juvenile Courts 90.)

. There is some empirical confirmation of the assumption that intense public attention interferes with a child’s readjustment and rehabilitation. L.B., the subject of extensive press coverage for an act of delinquency, was like many delinquents in that “he had not developed a personal sense of the importance of conforming to legal and moral behavior, [but] was capable of behavioral control when it was required in order to receive acceptance from others whom he viewed as important,” (Howard, Grisso and Neems, Publicity and Juvenile Court Proceedings, 11 Clearinghouse Rev 203, 209). A psychological evaluation and investigation concluded “that publicity placed additional stress on L.B. during a difficult period of adjustment in the community, and *** interfered with his adjustment *** when he was otherwise proceeding adequately,” and “played a part in the revocation of his home placement.” (Id., p 210.)

. It is perhaps useful to consider for future cases press acceptance of a formal, “voluntarily adopted code of ethics, whereby the names of juvenile offenders are not identified to the public” (Brian W. v Superior Ct., 20 Cal 3d 618, 623, quoting Report of the Governor’s Special Study Commission on Juvenile Justice, Part I — Recommendations for Changes in California’s Juvenile Court Law, p 24).

. It should be noted, however, that these cases involved prohibition of publication of information gathered in and out of the courtroom; did not involve a controlled access arrangement; and, in the case of Smith, involved an unjustifiable discrimination between print and electronic media and the use of criminal, rather than civil sanctions. The precise reach of a juvenile trial court’s power therefore remains in doubt.

. In this context it should be noted that the likelihood of preserving anonymity is much greater, and the case for admission therefore much stronger, where the focus of inquiry is the court or the juvenile justice system generally rather than a particular party.

. (Howard, Grisso and Neems, Publicity and Juvenile Court Proceedings, 11 Clearinghouse Rev 203, 211.)

. The court is grateful for the thoughtful memoranda of the applicant news organizations and the Legal Aid Society of the City of New York, Juvenile Rights Division,, as amicus curiae, and for the research assistance of Robert Apfel and Frances Reese Olivieri.