594 A.2d 70 (1991)
In re J.D.C., Appellant.
The Washington Post, Intervenor.
No. 91-345.
District of Columbia Court of Appeals.
Argued June 5, 1991.
Decided July 3, 1991.
*71 Elizabeth G. Taylor, Public Defender Service, with whom James Klein, Gretchen Franklin, Sandra Levick, Stephen I. Singer, and Robert Wilkins, Public Defender Service, were on the brief, Washington, D.C., for appellant.
Michael A. Simons, with whom Barbara P. Percival and Mary Ann Werner were on the brief, Washington, D.C., for The Washington Post, intervenor.
Charles L. Reischel, Deputy Corp. Counsel, John Payton, Corp. Counsel, and Donna M. Murasky, Asst. Corp. Counsel, Washington, D.C., filed a memorandum in lieu of brief.
Theodore J. Boutrous, Washington, D.C., and Richard J. Tofel, New York City, filed an amicus curiae brief, for Dow Jones & Co., Inc.
Before STEADMAN, SCHWELB and WAGNER, Associate Judges.
*72 SCHWELB, Associate Judge:
J.D.C., who is fourteen years of age, has been charged as a juvenile in the shooting death of fifteen-year-old Jermaine Daniel, whose friendship with former Chief of Police Maurice T. Turner, Jr., had received considerable publicity in the media. J.D.C. has filed this expedited appeal from an order of a judge of the Family Division of the Superior Court denying in part his motion to exclude members of the media from attending the factfinding hearing[1] and subsequent proceedings in his case.
J.D.C.'s motion was predicated primarily on the publication in The Wall Street Journal, several days before the scheduled trial date, of an article which identified J.D.C. by name and which, among other things, stated as a fact that he had shot Daniel to death. J.D.C. contended below, and now maintains on appeal, that in light of the disclosure of his identity, any further press coverage would inevitably be linked with him, for his name would be readily discoverable by anyone who cared to know it. The trial judge granted J.D.C.'s motion as to the Journal, but denied it as to The Washington Post and other media which had not disclosed J.D.C.'s identity.
The primary purpose of D.C.Code § 16-2316(e) (1989) and of Super.Ct.Juv.R. 53, which provide that in general the public shall be excluded from juvenile proceedings, is to preserve the anonymity of juvenile respondents in order to foster an atmosphere conducive to rehabilitation. Both the statute and the rule authorize the judge to permit members of the media to attend juvenile proceedings provided that they do not divulge information identifying the child or members of his family. We hold that the proscription against disclosure of the juvenile's identity represents a legislative intention to authorize admission of the press only if there is reasonable assurance that the primary goal of protecting the child's anonymity can be achieved.
We recognize that the judge made a thoughtful and conscientious effort to exercise his discretion judiciously and to balance what he viewed as the legitimate competing interests. We conclude, however, that in light of the unusual circumstances generated by the publication of the Journal article, there is no reasonable assurance that J.D.C.'s anonymity can be adequately protected in the event of press coverage of further proceedings in the case. Accordingly, we reverse the order on appeal and remand the case with directions that the trial court grant J.D.C.'s motion to exclude the media.

I

THE FACTS
Shortly after Jermaine Daniel's death, J.D.C. surrendered to police. A judge found probable cause to believe that he had committed the offenses with which he was charged. J.D.C. was detained at the Children's Center, where he remains to the present date. His case was promptly scheduled for trial.
A few days before the designated trial date, however, The Wall Street Journal published an article headlined
KILLING OF 15-YEAR-OLD IS PART OF ESCALATION OF MURDER BY JUVENILES.
The article opened as follows:
WASHINGTON[J.C.][2] and Jermaine Daniel face each other in the concrete courtyard of their inner-city housing project. They had argued about a girl. Now, a crowd gathers as Jermaine flicks insults at [J.].
Suddenly [J.] pulls out a gun and shoots Jermaine three times in the chest.
The dead boy is 15. The shooter is 14.
The Journal's story contained other material regarding J.D.C. which depicted him and his family unfavorably, and which related a number of alleged facts of a private nature. Counsel for J.D.C. maintain that much of the information in the article is inaccurate.
Prior to the publication of the Journal article, reporters from The Washington Post, The Wall Street Journal, and at least one other newspaper had attended *73 court hearings in the case, despite J.D.C.'s objection to their presence. Each reporter had agreed in writing, pursuant to Super.Ct.Juv.R. 53(a), not to divulge information identifying J.D.C. and his family. Two days after the publication of the Journal article, counsel for J.D.C. filed a written "Unopposed"[3] Motion to Exclude Media From All Further Proceedings." On the scheduled trial date, the Post, in a story headlined
PRINTING OF DANIEL SUSPECT'S NAME BASIS OF MOVE TO CLOSE TRIAL,
revealed the disclosure of J.D.C.'s identity by the Journal, as well as the date of that disclosure, and repeated some of the unfavorable statements about J.D.C. contained in the earlier article in the Journal.
Although the judge ultimately had three separate occasions to articulate the reasons for his rulingonce orally and twice in writinghis reasoning remained generally consistent throughout.[4] He stated in his initial written order dated April 5, 1991, that it was his responsibility to "balance the confidentiality interest of the respondent against the legitimate interest of the media in covering the workings of the juvenile system." He indicated early in his oral ruling that "if I am going to err, it ought to be on the side of protecting the identity of the respondent." Applying these principles to the case before him, the judge stated in his April 5 order that The Wall Street Journal had revealed J.D.C.'s name.
in apparent violation of its pledge not to reveal identifying information.[5] Subsequent coverage by The Wall Street Journal, even where the respondent's name was not used, would have to connect him, at least with regard to its readers, to the earlier coverage.
Though subsequent Wall Street Journal coverage would tend to identify, and possibly harm, the respondent among its readers, the Court does not believe that others who follow the case by other means would necessarily be similarly affected. There is simply no way to determine the set of those people who read The Wall Street Journal article and who have also followed this matter by other media means. Without proof of a connection between these other readers or viewers and The Wall Street Journal coverage the Court is reluctant, given Rule 53, to bar those members of the media who have complied with the rules. By not permitting The Wall Street Journal access to further proceedings, the damage done to respondent's interests can, hopefully, be minimized.
J.D.C. filed a motion for reconsideration in which he represented to the court that the Journal's circulation in the District is fifty-five thousand copies per day, and the judge so found. In denying J.D.C.'s motion, the judge wrote, in pertinent part, as follows:
The potential harm to respondent is not due to the media's attending or reporting on this matter. Harm flows from disclosures made in violation of Rule 53. Such a disclosure was made by The Wall *74 Street Journal and that organization has now been excluded from any further court related proceedings. Though there is some overlap between those who read The Wall Street Journal and those who will follow this case by other means, there is simply no way to determine the extent of this overlap. Similarly, there is no way to quantify that group of people who will actually connect the respondent, as a result of the improper disclosure, to other coverage. The inability to quantify these overlaps (or inability even to say that an overlap actually exists) when coupled with the statutorily defined media interest is critical. There is no factual basis to support the action sought by respondent.
Order of May 29, 1991, at 3. Acknowledging that he too had "engaged in some degree of speculation," and that he could not "claim to know" whether readers of the Journal would still recall the article months later, id. at 3, the judge continued:
If the Court felt that there was any realistic chance that further coverage would materially affect respondent's privacy interest or, in the event of conviction, his chance at rehabilitation, the Court would bar all members of the media from further proceedings. The Court finds, however, that the welfare of the respondent will not be harmed by continued coverage of this matter by those who adhere to Rule 53.
Id. at 3-4.

II

LEGAL DISCUSSION

A. The statute, the rule, and the trial judge's discretion.
Both in the trial court and on appeal, the Post has explicitly disclaimed any contention that it has a constitutional right to attend J.D.C.'s trial.[6] Rather, the Post relies entirely on the discretionary authority of the judge pursuant to D.C.Code § 16-2316(e) (1989) and Super.Ct.Juv.R. 53 to admit representatives of the media to juvenile proceedings.
Section 16-2316(e) provides as follows:
Except in hearings to declare a person in contempt of court, the general public shall be excluded from hearings arising under this subchapter. Only persons necessary to the proceedings shall be admitted, but the Division may, pursuant to rule of the Superior Court, admit such other persons (including members of the press) as have a proper interest in the case or the work of the court on condition that they refrain from divulging information identifying the child or members of his family involved in the proceedings.
Rule 53(a)(1) repeats the general rule of exclusion, but goes on to provide that
a person having a proper interest in the particular case or in the work of the Division may be admitted upon approval of the judge before whom the hearing is scheduled, or his delegate. Such a person shall apply for permission to attend a hearing or series of hearings by stating in writing ... that he will refrain from divulging information [proscribed by § 16-2316(e)].
Rule 53(a)(3)(A) specifies that "[a]ny authorized representative of the news media" falls within a class of enumerated persons who "shall be deemed to have a proper interest in the work of the Division, and *75 shall be admissible[7] to Division hearings after filling out an application under subsection (a)(1) of this Rule...."
Both the statute and the rule use the word "may," which is quintessentially permissive. The litigants therefore acknowledge, and we agree, that the determination for the judge is a discretionary one. The scope of our review is correspondingly constricted; we can reverse only for abuse of discretion. "[T]he trial judge, wielding discretionary power, need not be right by appellate court lights in order to be upheld. Even if the appellate judges disagree with his call, they will defer to him." Johnson v. United States, 398 A.2d 354, 362 (D.C.1979) (quoting Rosenberg, Judicial Discretion of the Trial Court Viewed from Above, 22 SYRACUSE L.REV. 635, 650 (1971)).
Judicial discretion must, however, be founded upon correct legal principles, Conrad v. Medina, 47 A.2d 562, 565 (D.C.1946), and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards. Jett v. Sunderman, 840 F.2d 1487, 1496 (9th Cir.1988); see also Johnson, supra, 398 A.2d at 365. Moreover, "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation.... [I]t is an abuse [of discretion] if the stated reasons do not rest upon a [sufficient] factual predicate." Johnson, supra, 398 A.2d at 364 (citations omitted).[8] J.D.C. contends in effect that the trial judge approached his task of exercising discretion with a legally incorrect predicate, thereby misallocating the burden of proof, and that he based his decision on a flawed determination that further press coverage would not result in the harm which the statute was designed to prevent. We examine each contention in turn.

B. J.D.C.'s challenge to the trial judge's legal conclusions.
In the present instance, both the statute and the rule which implements it provide a substantial measure of guidance with respect to the weight which is to be accorded to various factors in the exercise of the court's discretion. The basic rule of the statute, repeated in the rule, is that juvenile proceedings are closed. The judge may permit the media to attend, but only "on condition that they refrain from divulging [identifying] information. . . ." § 16-2316(e) (emphasis added). Persons with a proper interest, including reporters, may be admitted to a proceeding, but only to the extent that the overriding policy of confidentiality is not compromised. If, in any given situation, adherence to this policy cannot be effectively accomplished without excluding the media, then the statute and rule logically dictate exclusion. Put another way, if there is no reasonable assurance that the admission of the press will be consistent with the protection of a juvenile respondent's anonymity, then exclusion may be the only alternative which will not compromise the legislature's paramount aim.
The primacy which our statute and Rule 53 accord to the protection of the juvenile's right to anonymity finds substantial support in reason, precedent and authority. The Supreme Court has remarked that all fifty states have statutes which provide in some way for confidentiality of juvenile proceedings. Smith v. Daily Mail Publishing Co., 443 U.S. 97, 105, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979). "It is the law's policy to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past." In re Gault, 387 U.S. 1, 24, 87 S.Ct. 1428, 1442, 18 L.Ed.2d 527 (1967). As Justice (now Chief Justice) Rehnquist cogently observed in his separate opinion in Smith, supra, *76 [i]t is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been conducted outside ... the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity.... Publication of the names of juvenile offenders may seriously impair the rehabilitative goals of the juvenile justice system and handicap the youths' prospects for adjustment in society and acceptance by the public.... This exposure brings undue embarrassment to the families of youthful offenders and may cause the juvenile to lose employment opportunities or provide the hardcore delinquent the kind of attention he seeks, thereby encouraging him to commit further antisocial acts.... Such publicity also renders nugatory States' expungement laws, for a potential employer or any other person can retrieve the information the States seek to "bury" simply by visiting the morgue of the local newspaper. The resultant widespread dissemination of a juvenile offender's name, therefore, may defeat the beneficent and rehabilitative purposes of a State's juvenile court system.
443 U.S. at 107-08, 99 S.Ct. at 2673 (Rehnquist, J., concurring in the judgment) (citations omitted).
Courts take these truths seriously. "The [paramount][9] issue in a juvenile proceeding is the care, needs and protection of the minor and his rehabilitation and restoration to useful citizenship." In re J.S., 140 Vt. 458, 465, 438 A.2d 1125, 1127 (1981) (citation and internal quotation marks omitted). Disclosure of the juvenile's identity may "impair the rehabilitative goals of the juvenile justice system." Id., 438 A.2d at 1129.[10] Indeed, in light of the harmful impact which publicity may have on the child, it has been held that the judgment of the child's counsel that closure is in the client's best interest must be given "great weight," In re Robert M., 109 Misc.2d 427, 431-32, 439 N.Y.S.2d 986, 990 (Fam.Ct.N.Y.County 1981), and we agree that counsel's view is, at least, a factor which should be seriously considered. In any event, juvenile proceedings are nonpenal and rehabilitative in nature, see Kent v. United States, 383 U.S. 541, 554-55, 86 S.Ct. 1045, 1053-54, 16 L.Ed.2d 84 (1966) (describing District's Juvenile Court Act as "rooted in social welfare philosophy" and civil rather than criminal), and the interest of the child must be a significant concern.
The competing interest of the press or of a member thereof to attend a specific juvenile proceeding stands on far less firm footing. Adult criminal trials have traditionally been open to the public, and representatives of the media have a right to attend them. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 572, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980). These principles do not control, however, where the interests of a minor child are at issue. Morgan v. Foretich, 521 A.2d 248, 252 (D.C.1987); see also Mokhiber v. Davis, 537 A.2d 1100, 1108 n. 8 (D.C.1988). As the court explained in Edward A. Sherman Publishing Co. v. Goldberg, ___ R.I. ___, ___, 443 A.2d 1252, 1258 (1982),
[t]he right of access to criminal trials, as established in Richmond Newspapers. . . does not apply to juvenile proceedings. The principle of an open trial has as its goals the protection of a defendant against possible prosecutorial or judicial abuse. The interests of the juvenile, however, are most often best served by anonymity and confidentiality.
*77 Where, as here, the juvenile has expressly waived his right to a public trial, the protections of the accused which are at the heart of the concept of a public trial have no application, and the arguments for access by the press become significantly attenuated. Rule 53(a) recognizes that the press has an institutional interest in "the work of the [Family] Division," but "a desire to publicly disseminate the facts of a juvenile proceeding is not [necessarily][11] a proper interest in the case or in the work of the court." In re J.S., supra, 140 Vt. at 470, 438 A.2d at 1130 (statutory citation and internal quotation marks omitted). Given the underlying rule of confidentiality, the interest of the press is at its zenith when it seeks to report on the workings of the court, but at the other end of the spectrum when it proposes to cover a specific juvenile proceeding, especially one in which, as in this case, the respondent's identity has previously been widely publicized. "[T]he likelihood of preserving anonymity is much greater, and the case for admission therefore much stronger, where the focus of inquiry is the court or the juvenile system generally rather than a particular party." In re Robert M., supra, 109 Misc.2d at 431 n. 12, 439 N.Y.S.2d at 990 n. 12.
Our statute and the foregoing authorities demonstrate that where, as here, a juvenile's identity has been widely publicized, the competing interests posited by the trial judge are not equal. In the final analysis, at least on these facts, fidelity to the statutory scheme requires us to hold that the respondent's right to anonymity trumps the media's interest in attending and reporting on proceedings in a specific juvenile case. Although, as the judge explained in his second written order, he did not rely on a "presumption" that the press should be permitted to attend, we do not think that he gave sufficient weight to the underlying policy of the statute. The judge grounded his first written order on his belief that those who did not read The Wall Street Journal would not "necessarily" connect future reporting of the case with his identity. (Emphasis added). He indicated that if The Wall Street Journal alone were excluded, then "the damage done to respondent's interest can, hopefully, be minimized." (Emphasis added). In his subsequent order of May 29, 1991, the judge found J.D.C.'s inability to quantify the overlap between readers of the Journal and of the Post, or the number of persons likely to recall his name from the Journal article, to be a "critical" defect in J.D.C.'s showing. Implicitly but unambiguously, the judge placed the burden on J.D.C. to show that the admission of the press to further proceedings in his case was likely to harm him.
We hold that this was error. If, as the judge found, "there is no way to quantify the group of people who will actually connect the respondent, as a result of the improper disclosure, to other coverage," then a statute which is designed to protect J.D.C.'s anonymity cannot be construed as placing on him the burden of that uncertainty. The judge plainly was not at all sure whether the prejudice to J.D.C. by the Journal's disclosure of his identity could be contained if the media were admitted. The use of the words "necessarily" and "hopefully" leaves no doubt on that score. Given that uncertainty, the motion for exclusion should have been granted rather than denied.

C. J.D.C.'s challenge to the trial judge's determination of the likelihood of future harm.
After ordering the exclusion of The Wall Street Journal but characterizing J.D.C.'s arguments for excluding other media as "more speculative," the judge stated that J.D.C. "will not be harmed by continued coverage of this matter by those who adhere to Rule 53." See the portion of his opinion quoted at page 74, supra. According the trial judge's statement a reasonable *78 measure of deference, we are satisfied that it cannot stand.
Some fifty-five thousand copies of a newspaper containing J.D.C.'s name, and describing him as the killer of a youngster who, through his association with the former Chief of Police, had become comparatively well-known, were distributed in the District of Columbia. Countless others were sold across the country. If J.D.C. were found guilty at the factfinding hearing, and if this were reported in the press (even without his name being disclosed), then surely a few readers of the Journal,[12] if not a great many of them, would learn of the event and recall J.D.C. by name. Those who did recall his identity might reasonably include a prospective future employer or college admissions officer, or some other individual who could play a meaningful role in this youngster's life and might be in a position to do him good or ill. The Post has not presented any facts upon which we could conclude with reasonable assurance that, in the event of further coverage, persons who could affect J.D.C.'s life in a significant way could not or would not recall or learn his identity.
But even if we could reasonably assumeand we cannotthat all or almost all those who have now read the Journal article have forgotten J.D.C.'s name, or would otherwise be unaffected by further coverage, then even these assumed facts would not adequately assure for J.D.C. protection from further harm. Beyond the class of persons who will immediately know the identity of the juvenile on whom the press will be reporting if it covers the trial, there is the potentially far widervirtually universalclass of those who will have the potential to discover it. The Post, our capital's most widely read daily newspaper, has already revealed that J.D.C.'s name was published in the Journal, and has also disclosed the date of publication.[13] If the details of future proceedings in the case receive coverage in the media, then even if that coverage is anonymous, anybody who cares to do so will be able to ascertain the identity of the respondent without the slightest difficulty "simply by visiting the morgue of the ... newspaper." Smith, supra, 443 U.S. at 108, 99 S.Ct. at 2673 (Rehnquist, J., concurring). Moreover, such a person will then have a constitutional right to disclose J.D.C.'s identity to the world. Id. at 103-06, 99 S.Ct. at 2670-72 (majority opinion).
We have no reason to be confident that such a disclosure would not in fact occur. In the first place, The Wall Street Journal, which first revealed J.D.C.'s identity, has certainly provided no assurance to that effect. Indeed, in its amicus brief, Dow Jones quoted with apparent approval[14] the following passage from one of the Post's articles about the case:
Thomas Petzinger Jr., the Journal's deputy Washington bureau chief, said that publishing the youth's name was something we deliberated about a great deal. We thought the story really demanded it.
To omit the name of one of the principals in the casenotwithstanding that he's an adolescentwould have conferred an anonymity on this story that would have made it less believable and less powerful. And this is a story that had to be told powerfully, Petzinger said.
The perceived or actual need for a "powerful" narrative will not necessarily have abated, for the Journal or for other publications, when the case goes to trial or disposition and the time arrives for a sequel to the original story. The Journal could base such a sequel on information derived from reports by media which have not been excluded from the proceedings. Accordingly, we are unable to share the trial judge's confidence that J.D.C. will escape *79 unharmed if the press is admitted to further proceedings in his case.
The Post argues that the publication of juvenile proceedings, even without disclosure of a respondent's identity, may in the generality of cases be linked to the respondent by those already aware of his brush with the law. See Rogers v. United States, 566 A.2d 69, 76 (D.C.1989) (en banc), in which this court noted that arrests of juveniles may be known and discussed by persons who know the individual arrested. This sort of risk cannot, however, fairly be compared with the present case, in which J.D.C.'s name has been revealed by a newspaper which has firmly expressed its position that the child's identity is essential to its news coverage. The danger of disclosure would be far greater here if the press were admitted for, as a result of the Journal article, J.D.C.'s name, as well as the proceedings against him, would be chronicled in perpetuity in the written word. Accordingly, contrary to the Post's contention, to require exclusion of the media on these facts will not logically compel exclusion in the ordinary case in which the respondent's name has not previously been revealed in the press.
We likewise cannot agree with the notion that the cat is already out of the bag and that it would now be futile to attempt to do anything about it. Assuming that the kitten's whiskers (or even its tail) may be showing, the rest of the body remains concealed. As the court cogently wrote in State in the Interest of D.B., 181 N.J.Super. 586, 592, 439 A.2d 94, 98 (1981),
[p]etitioners urge that since D.B.'s name has already received widespread publication there is no further need for confidentiality. The extension of this argument would provide that once the name is obtained from "other sources" by one paper the media can proceed to divulge details of his family life and the consultants' reports without restraint. This would in effect leave control of the confidentiality of the juvenile court solely in the hands of a newspaper. Public curiosity or the newsworthiness of events can never be a justification for unrestrained release of information. The notoriety of the delinquent acts must not be considered as a reason for juvenile courts to abandon their rehabilitative purpose. The repeated emphasis upon D.B.'s misdeed, including not only his name but adding additional details on his family, friends and school relationships, will compound the effects of exposure on any rehabilitative plan.
Accord, In re J.S., supra, 438 A.2d at 1129.

III

CONCLUSION
For the foregoing reasons, the order appealed from is reversed, and the case is remanded with directions to grant J.D.C.'s motion to exclude the media from all further proceedings in his case.
So ordered.[15]
NOTES
[1] In juvenile cases, the trial on the merits is known as the "factfinding hearing." D.C.Code § 16-2301(16) (1989).
[2] The article used J.D.C.'s first name and surname.
[3] Although the motion was unopposed by the Corporation Counsel, representatives of the Post were to oppose it vigorously. The Assistant Corporation Counsel assigned to prosecute the case left this field of battle to those directly involved, remarking that "I feel kind of like a supernumerary in an opera holding the spear while Aida sings." In this court, however, the Corporation Counsel decided to enter the fray, and has filed a short memorandum urging affirmance.
[4] J.D.C. claims that in his first written order, the judge articulated a "presumption" that members of the press should be admitted to juvenile proceedings. The judge forcefully disclaimed in his second order that he had indulged such a presumption and, although portions of the first order could plausibly be read as counsel for J.D.C. reads them, the judge apparently intended to convey in slightly different language the import of the provision in Rule 53(a)(3)(A) that representatives of the media shall be "deemed to have a proper interest in the work of the Division...."
[5] Dow Jones & Co., Inc. (Dow Jones), the publisher of the Journal, claims in its amicus brief that it discovered J.D.C.'s identity from other sources, and denies violating its pledge. Dow Jones argues that under these circumstances, the judge unconstitutionally penalized it for exercising its rights. Since Dow Jones did not intervene in the case or appeal from the trial court's order, the issue discussed by Dow Jones is not before us. See, generally, Edward A. Sherman Publishing Co. v. Goldberg, ___ R.I. ___, 443 A.2d 1252 (1982).
[6] Although there is a "heavy presumption" against the constitutional validity of a "prior restraint," Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971), that principle is not implicated here. A prior restraint occurs when the state attempts to prohibit the publication of material already in the possession of the media. In re T.R., 52 Ohio St.3d 6, 19-20, 556 N.E.2d 439, 452, cert. denied, ___ U.S. ___, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990); Florida Freedom Newspapers v. McCrary, 520 So.2d 32, 35 (Fla.1988). "The press enjoys no greater right of access to juvenile proceedings than does the general public." Edward A. Sherman Publishing Co., supra note 5, ___ R.I. at ___, 443 A.2d at 1258. Since juvenile proceedings are not open to the public, denial of access to the press "does not place the press in any less advantageous position than the public generally." Saxbe v. Washington Post Co., 417 U.S. 843, 849, 94 S.Ct. 2811, 2814, 41 L.Ed.2d 514 (1974).
[7] The use of the word "shall" does not, in context, mean that admission of the press is mandatory. The rule says that the media shall be deemed admissible (i.e., eligible to be considered for admission), not that they must be admitted.
[8] As the court explained in Johnson, supra, 398 A.2d at 364, "the facts may leave the trial court with but one option it may choose without abusing its discretion, all the others having been ruled out."
[9] The court used the word "only," but we think the word "paramount" should be substituted therefor.
[10] The court continued as follows:

Confidential proceedings protect the delinquent from the stigma of conduct which may be outgrown and avoids the possibility that the adult is penalized for what he used to be, or worse yet, the possibility that the stigma becomes self-perpetuating, thereby making change and growth impossible. Publication of a delinquent's name may handicap his prospects for adjustment into society, for acceptance by the public, or it may cause him to lose employment opportunities. Public proceedings could so embarass the youth's family members that they withhold their support in rehabilitative efforts.
Id., 438 A.2d at 1129 (citations omitted).
[11] We have added the bracketed adverb to the language used by the Supreme Court of Vermont.
[12] At the very least, the employees of The Wall Street Journal would be well aware of the identity of the individual to whom reports of further proceedings in J.D.C.'s case would refer, and they might well publicize it. As we note below, the Journal has not accorded high priority to the protection of J.D.C.'s anonymity.
[13] Because courts must explain their decisions, every reader of this opinion will likewise know where to find his name.
[14] We assume that if the remarks attributed to the Journal's spokesman had been inaccurate Dow Jones would have said so.
[15] The division is prepared to entertain a motion to expedite the issuance of the mandate if expedition is necessary to preserve the scheduled trial date.