677 A.2d 514 (1996)
In re S.L.E., J.M., Appellants.
In re S.L.E., District of Columbia, Appellant.
Nos. 94-FS-146, 94-FS-782.
District of Columbia Court of Appeals.
Argued March 21, 1996.
Decided June 6, 1996.
*515 Madhavankutty K. Nair for appellant J.M.
Sonia A. Bacchus, Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant District of Columbia.
Judith A. Lovelace for appellee S.L.E.
Before WAGNER, Chief Judge, and TERRY and SCHWELB, Associate Judges.
SCHWELB, Associate Judge:
The District of Columbia appeals from a Superior Court order terminating judicial involvement in a child neglect proceeding and thus ending the court's responsibilities vis-a-vis a little girl who had been physically and sexually abused by her mother's live-in boy-friend. The District contends that the trial judge abused her discretion in closing the case in the absence of any evidence that the abuser had complied with the court's orders, that he had discontinued the use of unlawful drugs, or that he had otherwise established that his unsupervised presence in the home would no longer constitute a danger to the child. We reverse.

I.

THE TRIAL COURT PROCEEDINGS
On June 1, 1992, respondent S.L.E. was living with her mother, her two brothers (aged 17 and 9), and J.M., her mother's livein male companion. S.L.E. later testified that, on that day, she and her 9-year-old brother returned from school at about 3:30 p.m. Their mother was at work, but J.M. was at home. J.M. gave S.L.E.'s brother some money and sent him to the store. He then entered S.L.E.'s bedroom and locked the door behind him. According to S.L.E.,
I was in the bedroom and I was doing my homework, and [J.M.] came in there and told me to take [off] all my clothes, and I said, no, no, and I covered my eyes and put my hands behind my back. And he took the towel off and he told me to touch his private part, and I did and I covered my eyes again. And then he pulled me down and choked me and told me if I told my mamma, that he would kill me and my mommy.
S.L.E. was eight years old.
Two of S.L.E.'s schoolmates reported the "incident" to a teacher, and the police were notified. The District instituted child neglect proceedings against J.M. on June 5, 1992, alleging that he was acting "in loco parentis" towards the child. Following an initial hearing on that date, Judge Joseph M.F. Ryan ordered that S.L.E. continue to live with her mother, and that J.M. "stay away from the child and the child's home."
*516 A fact-finding hearing was held on February 17, 1993 before Judge Patricia A. Wynn. S.L.E. testified, but J.M. did not. At the conclusion of the hearing, the judge made oral findings of fact and conclusions of law, which were later converted into a written order. The judge specifically found that at the time of the abuse, J.M. was living with S.L.E. and her family, and that he
acted in loco parentis with regard to [S.L.E.] and her brother. He looked after them at home each day when they returned from school, accompanied them on outings on the weekends such as to the movies or to the circus, and purchased clothes and food for them on occasion.
The judge further found as follows:
By a preponderance of [the] evidence, the District of Columbia has demonstrated in this case that [S.L.E.] was abused by [J.M.], her mother's paramour, on June 5, 1992. The court credits all aspects of [S.L.E.'s] testimony regarding the incident, including [J.M.]'s commands that [S.L.E.] undress and that she touch his private parts. It was clear that [S.L.E.] has described the incident many times, given that she recounted the events in virtually the same words several times during the course of her testimony. In spite of that fact, the court finds [S.L.E.] to be both a competent and a credible witness. Even if the court did not credit [S.L.E.'s] testimony regarding the sexual aspects of the incident, the choking alone would be sufficient for a finding of neglect under D.C.Code § 16-2301(9)(A) [1989].
The judge found that S.L.E. was an abused child. She ordered that, pending the disposition hearing, S.L.E. remain in the care and custody of her mother, subject to the condition that the child, her mother, and J.M. all participate in family counseling. The judge ordered J.M. to stay away from S.L.E. and from her home, "other than for supervised visitation with her at the discretion of the probation officer."
The disposition hearing was held on April 5, 1993. S.L.E.'s guardian ad litem (GAL) expressed concern about developments since the trial. She complained that notwithstanding the stay-away order, there had apparently been substantial contact between S.L.E. and J.M.. She also related that the mother appeared to be angry regarding court intervention and was now questioning whether the abuse had in fact occurred. J.M.'s counsel asserted that his client would participate in family counseling, and that there was no reason to retain in effect the previously issued stay-away order. The judge emphatically disagreed.[1] At the conclusion of the hearing, the judge ordered that S.L.E. be placed with her mother under the protective supervision of the court. See D.C.Code § 16-2320(a)(2) (1989 & 1995 Supp.). The judge also continued in effect the stay-away order against J.M.,[2] but no inquiry was apparently made as to whether there had been prior violations of that order.[3]
Several review hearings were held over the thirteen months that followed. At the first of these hearings, on August 4, 1993, the Assistant Corporation Counsel stated that during a session with the family therapist, J.M. had admitted to "drinking and using cocaine," and that J.M. was apparently claiming that his sexual abuse of S.L.E. was due to his substance abuse. Over the objection of counsel for J.M., the judge ordered that J.M. submit to weekly drug testing, with the *517 proviso that "if [there are] four consecutive negative results, testing may stop." The judge also authorized supervised visitation between S.L.E. and J.M.; she stated, in response to a question from counsel, that such visitation was to continue regardless of the results of the drug tests.
Unfortunately, J.M. did not comply with the court's order. On August 4, 1993, the day of the review hearing, he tested positive for cocaine. He failed to appear for any of his other scheduled urine tests, and he apparently ignored the stay-away order. The social worker expressed her apprehension regarding S.L.E.'s safety if protective supervision were discontinued, noting that J.M. was once again living in the family home and might still be using cocaine.[4] The judge, however, believed that the case should soon be closed:
I think the thing that has changed since this case came in is the fact that ... the mother became aware of the potential for this problem, and I really don't think that there's a continuing role for the court in this matter.
The judge ordered a psychological examination of S.L.E., and directed that "[p]rotective supervision shall be terminated in 45 days unless any party requests an additional hearing based on the results of the psychological examination."
On November 23, 1993, S.L.E. was examined by a clinical psychologist, who reported that, according to S.L.E. and her mother, J.M. was once again living in the family home. The psychologist found that
[S.L.E.] appears to be experiencing a great deal of inner anxiety and tension that is possibly related to unresolved concerns and issues related to the abuse she suffered. Her relationship with her mother may have been somewhat compromised because of her mother's disbelief of [S.L.E.'s] charges and [her] mother allowing [J.M.] to return to the home. She is dependent on her mother in so many ways and her feelings may not be easily expressed because of the conflict between her feelings and her dependency needs. [S.L.E.] continues to feel very uneasy in the company of [J.M.]. She realizes that he was under the influence of alcohol and/or substances when the abuse occurred and is fearful that the same thing will happen again. Even though her mother is always around, she continues with these feelings.... It also appears that [J.M.] has been allowed to "get away" with his actions because he has not been made to face up to them in the legal system [or] in therapy. He used the pretext of not recalling his actions because he was intoxicated and high. He also ha[s] not complied with the Probation Officer's request to submit a detailed report about the incident.
The psychologist had reservations as to whether S.L.E. could enjoy a "physically and emotionally safe environment" with J.M. in the home.[5] She recommended, inter alia, that
[u]nder no circumstances should [S.L.E.] be left alone with [J.M.]. She does not feel safe with him and it is unclear regarding his inclination for repeated involvements in abusive incidents.
The psychologist also believed that S.L.E. should receive individual therapy (at which *518 she would not be inhibited from speaking her mind by the presence of her mother and J.M.), and that J.M. should also receive individual counseling and should be psychologically evaluated in order to determine whether further molestation was likely to occur.
On February 2, 1994, in light of the psychologist's recommendations, as well as the concerns for S.L.E.'s safety which were expressed by several other participants at the hearing, the judge decided not to close the case. Instead, the judge continued S.L.E.'s placement with her mother under the protective supervision of the court. The judge declined to order a psychological evaluation of J.M., but did order that J.M. participate in individual counseling. The judge conditioned any further contact between J.M. and S.L.E.
on his cooperating and participating in the counseling referral that is made and if he doesn't, then we're back here in court and he's out of the house.[[6]]
A very brief final review was held on May 18, 1994. In a report filed in preparation for that review, the probation officer recommended that the case be closed. He stated, inter alia, that the mother and daughter had "bonded," that S.L.E. was not uncomfortable when J.M. "visits" the home,[7] and that both mother and daughter found further counseling services counterproductive. The probation officer found it "clear that [S.L.E.] will report anyone who tries to abuse her in the future." He wrote that, according to the family therapist, S.L.E., then ten years of age, could "stave off" further abuse in the home, and was "equipped to protect herself from harm's way." The probation officer advised the court that J.M. had submitted to urine tests twice during April and May, but that the results were not yet available.[8]
The probation officer's report did not disclose whether or not J.M. had participated in counseling, as the court had ordered. Apparently, J.M. was not asked, and nobody at the final hearing made any inquiry on the subject.
With the agreement of all parties except counsel for the District, who was not present but whose objection was noted, the judge ordered that "[t]he present protective supervision shall be terminated as of 5/18/94 and the child shall be discharged from the jurisdiction of the [Family] Division." The judge stated:
I am satisfied that the child is not in danger, that she has worked through some of the issues that she needed to work through, in order to make sure that she's completely comfortable in her living situation. And that it is indeed time for this family unit to operate on its own without the interference of the court system and all of its adjuncts.
The District filed a motion for reconsideration. The Assistant Corporation Counsel argued that the case should not be closed because J.M., who was once again "an integral part of the family," had tested positive for drugs and had not complied with court orders regarding, inter alia, further urine testing and counseling. The District urged that
the court should focus on the safety of the child and require [J.M.] (and the entire family) to follow the court's orders. [S.L.E.'s] best interests are met not by the court concluding that because of the lack of cooperation of [J.M.] the case should be closed. The court has the option of focusing on [S.L.E.'s] safety and holding [J.M.] in contempt of court for violating the court's orders. . . .
The family dynamics have not changed. . . . [J.M.] has not engaged in treatment [for] issues surrounding the abuse. . . . It is perilous for [S.L.E.] to be placed in the identical situation in which the abuse occurred. Given that [J.M.] has not undergone any meaningful transformation, [S.L.E.] is clearly at risk for further abuse.
*519 The court denied the motion for reconsideration on June 3, 1994, stating only that
[a]ll other parties in this matter, including the [guardian ad litem], agree with the probation officer that it is in the best interests of [S.L.E.] that this case be closed. The court shares that view.
The District filed a timely notice of appeal.

II.

LEGAL DISCUSSION

A. The Best Interests of the Child.
The parties agree, and so do we, that the proper disposition of an abused child is committed to the sound discretion of the trial court, and that the trial court's exercise of discretion is reviewable only for abuse. See, e.g., In re A.M., 589 A.2d 1252, 1257-58 (D.C.1991). "Judicial discretion must, however, be founded upon correct legal principles,... and a trial court abuses its discretion when it rests its conclusions on incorrect legal standards." In re J.D.C., 594 A.2d 70, 75 (D.C.1991) (citations omitted); see also Johnson v. United States, 398 A.2d 354, 365 (D.C.1979). In addition, "[a]n informed choice among the alternatives requires that the trial court's determination be based upon and drawn from a firm factual foundation." Johnson, supra, 398 A.2d at 364; J.D.C., supra, 594 A.2d at 75.
"In child neglect cases, as in all proceedings affecting the future of a minor, the decisive consideration is the best interests of the child." In re S.C.M., 653 A.2d 398, 405 (D.C.1995). The court must act as parens patriae in the child's interest, and must not expose her to serious risk of harm. In re L.L., 653 A.2d 873, 886-87 (D.C.1995); In re L.W., 613 A.2d 350, 354-55 (D.C.1992). "Courts will not `gamble with a child's future.'" L.L., supra, 653 A.2d at 887 (quoting In re Interest of P.M.C., 231 Neb. 701, 437 N.W.2d 786, 792 (1989)). We have therefore stated that judges should "monitor the situation carefully and promptly take steps to protect [the child] if her physical or emotional welfare is endangered." S.C.M., supra, 653 A.2d at 406 n. 12.
The trial judge found that J.M. physically and sexually abused S.L.E. As the judge explicitly told J.M.'s attorney, such a finding "obviously ... presents a possibility of a future threat also." Sexual abuse of a small child is especially damaging to her physical and emotional welfare, and her protection from further mistreatment is of paramount importance.[9]
In the present case, the danger to S.L.E. posed by her molester was further compounded by his involvement with cocaine and alcohol and his evident inability or unwillingness to do anything about his substance abuse.[10] At the time this case was closed, there was no evidence that J.M. had stopped using cocaine or abusing alcohol.

B. J.M.'s Noncompliance.
In the present case, the judge who presided over the initial hearing and the judge who conducted the fact-finding hearing both recognized that it was necessary to order J.M. to stay away from S.L.E. and from her home. When it came to the trial judge's attention that J.M. was involved with unlawful drugs, *520 and that he apparently attributed his abuse of S.L.E. to his cocaine abuse, the trial judge appropriately ordered that he undergo urine testing. As we read the record, however, neither of these orders was effectively enforced.
Notwithstanding the issuance of the stay-away order, J.M. was soon either living with the family again (according to S.L.E. and her mother) or visiting so frequently that he had become, at least, a part-time resident. The judge was made aware of this situation, but took no action to enforce the stay-away order. Instead, she authorized "supervised visitation" in which the mother was supposed to be doing the supervising. The mother was put in charge even though her attitude was at best equivocal with regard to S.L.E.'s claim, credited by the judge, that J.M. had sexually molested her.
Moreover, the judge's order that J.M. submit to urine testing was surely designed to determine whether J.M. had been able to deal effectively with his cocaine problem. Unless the court intended to take effective steps to protect S.L.E. if J.M. continued to use drugs, the order served no useful purpose. Nevertheless, the judge took no action after J.M. tested positive for cocaine and after he failed to appear for his urine tests. Indeed, for the entire period that this case was before the court, the record shows only three urine teststwo positive, one negativeand the case was closed before the results of the two May 1994 tests were revealed.
In January 1994, the judge referred J.M. for individual psychological treatment. She stated that, if J.M. did not comply, he would be "out of the house." Four months later, however, the judge closed the case without any evidence that J.M. had followed up on his referral and, apparently, without any inquiry whether he had done so.
The trial judge thus released S.L.E. from the jurisdiction of the court without any significant compliance by the child's abuser with the very modest requirements imposed on him by the judge. It is not surprising, under these circumstances, that S.L.E. came to believe that the unspeakable acts which had been perpetrated upon her were not being taken very seriously by those who called the shots, and that her abuser had essentially "gotten away with it." Unsurprisingly, the psychologist reported that S.L.E. was uncomfortable and conflicted when J.M. was around, and that she was "fearful that the same thing would happen again."

C. The Lack of Any Recurrence.
The sexual molestation of S.L.E. which precipitated this proceeding occurred on June 1, 1992. The order terminating the court's jurisdiction was issued on May 18, 1994. Although there had been substantial contact between S.L.E. and J.M. in the period of almost two years during which the case was before the court, there was no further allegation of sexual or physical abuse.
Moreover, a GAL was appointed to represent S.L.E.'s interests. The GAL participated actively in the litigation. By May 1994, the GAL agreed that the case should be closed. Assuming that the GAL had consulted with S.L.E., at least to the extent that such consultation was feasible with a child of her ageand we have no reason to doubt that consultation occurredit appears that two years after the abuse, all of the members of the family wanted the government out of their lives.
The lack of a single complaint of misconduct by J.M. over a substantial period of time provides the strongest argument in support of affirmance of the judge's order. Certainty is seldom achievable, and governmental intrusion into a family's life ought not to be extended if, on the basis of past experience, the judge can reasonably be satisfied that there is no realistic danger of harm to the child.

D. Abuse of Discretion.
Notwithstanding the lack of any evidence of further abuse, however, we conclude that the judge's order closing the case was premature and that it was based in part on insufficient factual information and on incorrect legal standards. By releasing S.L.E. from the jurisdiction of the court, the judge effectively permitted J.M. to live in the family *521 home and to have unrestricted access[11] to the child whom he had molested. The lack of court supervision would mean that J.M.'s drug use would not be monitored, and that even continued abuse of cocaine on his part would not affect his right to unlimited contact with S.L.E. Moreover, there would be no supervision by anyonenot even by the motherof J.M.'s interactions with S.L.E. Notwithstanding the psychologist's warning that unsupervised association would endanger the child, the closing of the case meant that J.M. could lawfully be alone with S.L.E. and could exercise parental authority over her.
The new situation differed materially from that which existed while the court still retained jurisdiction. Prior to May 18, 1994, all of J.M.'s contacts with S.L.E. were supposed to be supervised, and the mother was expected to ensure that J.M. and S.L.E. would never be alone together. If these dubious arrangements did not work, then at least the court was available to do something about it. J.M. was thus aware that the court was looking over his shoulder. A good report card when one is under surveillance does not assure good behavior when no one in authority is looking. As the Supreme Court has recognized, if a case is dismissed, then "[t]he defendant is free to return to his [bad] old ways." United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).
In this case, there was no good report card, for J.M. did not comply with the court's orders even when the case was open. The judge relinquished her authority to supervise J.M.'s conduct at a time when he had failed to comply with the stay-away order, failed to discontinue his use of cocaine, failed to appear for court-ordered urine tests, failed to write a report for the probation officer, and, so far as the judge was aware, failed to cooperate with the referral for individual therapy. Moreover, the judge closed the case at a time when, although J.M. had finally appeared for two drug tests, the results of these tests were not yet available to the court. Further, although the psychologist had urged that J.M. be evaluated to determine his potential for further abuse of S.L.E., no such evaluation was ordered or conducted. Finally, only four months earlier, the judge had threatened to remove J.M. from the home if he did not participate in individual therapy, but she then released S.L.E. from the court's jurisdiction without any information as to whether J.M. had complied with an order which the judge had obviously viewed as being of great importance.
Under these circumstances, we conclude that the trial judge's exercise of discretion was not based on the "firm factual foundation" required by Johnson, supra, 398 A.2d at 364, and J.D.C., supra, 594 A.2d at 75. It appearing that J.M. had explicated his molestation of S.L.E. in terms of his drug abuse, and it further appearing that J.M.'s urine had finally been tested in the past few weeks, it was, in our view, premature to close the case without knowing the results of the urine tests. Given the character of the deed which J.M. had perpetrated upon this helpless little girl, and given the frequency with which many child molesters "do it again"and again and again[12]we also believe that the judge lacked a sufficient factual predicate for her order in the absence of an independent examination of J.M.'s potential for further abuse, as recommended by the psychologist. Finally, if the judge believed in January that individual therapy for J.M. was sufficiently important to warrant his removal from the home if he did not cooperate, it was surely premature to close the case in May without any information as to whether J.M. had cooperated *522 and, if he had, whether the therapy had been successful.
In addition, the trial judge's exercise of discretion apparently rested on a legal predicate with which we are constrained to disagree. The probation officer, on whose report the judge evidently relied in closing the case,[13] thought that S.L.E.then ten years of agewould be able to "stave off" further molestation and that she was "equipped to protect herself from harm's way." (Emphasis added). We agree with the District that the proper focus in a case such as this is not on whether the young victim has learned to "cope" with a situation in which her unpunished abuser would be authorized to exercise unsupervised parental authority over her, but rather on whether the abuser has reformed his conduct sufficiently to ensure S.L.E's safety and welfare. We quote the District's brief:
In reality, the court actually enabled J.M. to escape responsibility for his actions by simply claiming that he could not remember the incident because he was "high," and placed the responsibility of avoiding further abuse on the child. Now the child has to live in constant fear that whenever her mother's boyfriend, who was then and probably still is living in the home, "gets high," she has to look out for herself, and that is [wrong].
The judges of the trial court have broad authority to take whatever steps are necessary to protect the well-being of neglected and abused children. Our child neglect statute "vests the trial court with considerable latitude in crafting a disposition designed to reunite the family while safeguarding the well-being of the child." S.C.M., supra, 653 A.2d at 405. The best interest of the child is "the paramount consideration," and the statute should be liberally construed in a manner that would "enable the court to carry out its obligations as parens patriae" In re S.G., 581 A.2d 771, 778 (D.C.1990).
In the present case, J.M. was appropriately ordered to stay away from S.L.E. and her home, to desist from the abuse of drugs, to appear for urine testing, and to participate in individual therapy. All of these orders were reasonably calculated to make it possible, at some time in the future, to reunite even this troubled family, in which the substitute father had done his 8-year-old charge such a grievous and unspeakable wrong. If the court had rigorously enforced these conditions and achieved substantial compliance with its orders for an extended period of time, then reunificationeven unsupervised reunificationmight eventually have become appropriate. But where, as here, there had been no compliance with conditions designed to assure S.L.E.'s safety, the time to close the case (and thus to withdraw judicial protection from S.L.E.) simply had not yet come.

III.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion. Because of the lapse of time since the case was closed, the trial court is directed to make an appropriate inquiry on remand as to relevant developments since May 18, 1994, and to take whatever steps are necessary to assure the safety of S.L.E. from physical or emotional injury.
So ordered.[14]
NOTES
[1] The judge stated:

Well, I don't understand your reasoning. There has been [an] adjudication of neglect based on the court's finding [that] the child was sexually abused by [J.M.]. Obviously finding that fact presents a possibility of a future threat also, that's the reason for the counseling before the family could be reunified. I don't see how a fact finding hearing does away with that threat.
(Emphasis added).
[2] The judge stated that J.M. "accepts the idea that he will participate in family counseling and that [the court] would look at his rejoining the family based on how things go with that counseling."
[3] J.M. stated that he had had no contact with S.L.E. alone. According to the Assistant Corporation Counsel, however, J.M. had been with S.L.E. when other people were present. Counsel stated acidly that "[n]o contact means no contact, no matter who is around except for the family therapist." (Emphasis added). The District did not, however, initiate contempt proceedings or ask the judge to do so.
[4] The social worker stated that:

I have a lot of concerns, at this point, given that there is a finding of neglect, and that.... according to [S.L.E.'s] testimony at the trial, a violent act was committed on her, and that one of the probation officer's report[s] indicated that [J.M.] stated he was using drugs at the time, and, now, I'm reading in the report that he's living at [the] home, he's using cocaine, and they're all living there, together.
I have a problem with closing out the case when, basically, the circumstances seem sort of the same as when they came in, especially since nothing has been done, at this point, for his drug problem.
He hasn't gone to drug treatment. He, clearly, just isn't going for the rest of the drug testing, and I'm just concerned about [S.L.E.'s] safety, given that I don't know what has changed.
(Emphasis added).
[5] The psychologist recommended that if J.M. was to be permitted to stay in the homea possibility which plainly troubled the psychologistthen it was imperative that all of the psychologist's other recommendations be carried out, including an evaluation of J.M. with respect to his substance abuse and his potential for further molestation of S.L.E.
[6] The judge also ordered that S.L.E. be referred for "individual counseling."
[7] J.M. advised the probation officer that he was not living at the home but that he "visit[ed]" "at least 3-4 days/nights out of the week."
[8] It was determined, after the case had been closed, and after S.L.E. had been discharged from the court's jurisdiction, that J.M. had tested positive for cocaine on May 4, 1994 and negative twelve days later.
[9] We have no hesitation in concluding that any objection which the mother or J.M. may have to the exclusion of J.M. from the home is trumped by the court's obligation to protect S.L.E. from further harm.
[10] Cf. L.L., supra, 653 A.2d at 885 n. 25 (alteration in original):

The mother is a cocaine addict. We think it worth noting, in that connection, that drug addiction results, among other things, in significant changes in the chemistry of the brain, which cannot easily be reversed. G.F. UELMEN & V.G. HADDOX, DRUG ABUSE AND THE LAW § 2.3(a), at 2-13 to 2-14 (1990). Although short-term detoxification may not be difficult, "the problem is that after detoxificationeven years afterthe ex-addict remains at high risk of relapse." Id. at 2-14 (quoting Dr. Avram Goldstein, The Sidney Cohen Lecture (1986)); see generally Collins v. United States, 596 A.2d 489, 499-500 (D.C.1991) (dissenting opinion). As one court has recognized in a case in which addicted parents had not used drugs for more than a year, "[that] time frame is negligible when one considers the high rate of recidivism ... and the kind of risk that is involved in putting a child of [five] in the environment that drug addiction breeds." In the Interest of Ashley K., 212 Ill.App.3d 849, 156 Ill.Dec. 925, 942, 571 N.E.2d 905, 922 (1991).
[11] The GAL's brief refers to "the family's new arrangement whereby the child would not be alone with J.M.," and states that this arrangement, reported by the probation officer, was the basis for making S.L.E. "completely comfortable" in her home. After the case was closed, however, there would be no supervision of this arrangement, and there would be no consequences if it were violated. It is difficult to understand, in any event, how such an arrangement could possibly work when the mother is employed, and when J.M. would once again be a de facto parent for S.L.E., so that she would be required to obey him.
[12] See generally L.L., supra, 653 A.2d at 881, and authorities there cited.
[13] The final review at which the judge released S.L.E. from the jurisdiction of the court was very brief indeed, and the judge's decision appears to have been based entirely on the probation officer's report.
[14] The parties' other contentions need not detain us long. In her brief, the GAL contends that, at the time of the final hearing on May 18, 1994, the court was without jurisdiction to keep the case open because the order of protective supervision had expired by operation of law on April 5, 1994, and because the court had never extended it. This argument fails, however, because even if we were to assume that the court's jurisdiction is coextensive with the viability of a particular protective supervision order, the court's jurisdiction was duly extended at the February 2, 1994 hearing. On that occasion, the court, upon motion of the Assistant Corporation Counsel, and without objection, extended jurisdiction over S.L.E. "until the next hearing date." The next hearing in this case was held on May 18, when the case was closed.

In his separate appeal, J.M. claims that he was not acting in loco parentis and that the evidence was insufficient to show that he abused S.L.E. The trial judge specifically found, however, that J.M. resided in the same home with S.L.E. and her brother, supervised the children every day after school, accompanied them on weekend outings, and occasionally purchased food and clothes for them. In light of these findings, we conclude that J.M. was acting in loco parentis vis-a-vis S.L.E. S.G., supra, 581 A.2d at 784 n. 19. Furthermore, the trial judge having expressly credited S.L.E.'s testimony, there is ample evidence in the record to support a finding that J.M. abused S.L.E. within the meaning of D.C.Code § 16-2301(9)(A). See id. at 774-75.